## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                    No. CR 10-1919-002

KEVIN MICHAEL NOLF,

       Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) Plaintiff United States' Sealed Motion for Downward Departure, filed August 16, 2012 (Doc. 146)(ex parte)("Downward Departure Motion"); (ii) Defendant Kevin Nolf's Sealed Sentencing Memorandum, filed October 25, 2012 (Doc. 149)("First Nolf Brief"); (iii) the United States' Sentencing Memorandum and Response to Defendant's Sentencing Memorandum, filed October 27, 2012 (Doc. 150)(ex parte)("First U.S. Brief"); (iv) Nolf's Sealed Sentencing Memorandum in Support of a Sentence Below the Mandatory Minimum Sentence of Five (5) Years, filed January 28, 2013 (Doc. 168)("Second Nolf Brief"); and (v) the United States' Brief Regarding Sentencing, filed May 14, 2013 (Doc. 178)(ex parte)("Second U.S. Brief").  The Court held sentencing hearings on November 20, 2012, and July 17, 2013.  The primary issues are: (i) whether the Court should apply the Sentencing Guidelines' career offender enhancement, see U.S.S.G. § 4B1.1, to Nolf, where his

---

[1] In its Sealed Memorandum Opinion and Order, filed May 23, 2014 (Doc. 188)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO.  See Sealed MOO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions.  Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

only prior felony convictions are a 1999 possession of marijuana and a 2003 aggravated assault, and, absent the enhancement, and he would only have 6 criminal history points and be placed in criminal history category III; (ii) whether the Court may sentence Nolf to a term of imprisonment below the statutory mandatory minimum by combining a downward departure for substantial assistance to the government, see U.S.S.G. § 5K1.1, that would not on its own result in a sentence below the statutory mandatory minimum, with a downward variance; and (iii) whether the Court should vary Nolf's sentence downward from the 63-78 month sentence range that the Guidelines prescribe.  The Court will apply the career offender enhancement to Nolf, because he meets the criteria of U.S.S.G. § 4B1.1(a), and that provision of the Guidelines -- beyond simply being a sound embodiment of Congress' statutory mandate to the Sentencing Commission -- is a near carbon-copy of 28 U.S.C. § 994(h).  The Court lacks the authority to depart or vary below the statutory mandatory minimum, because 28 U.S.C. § 3553(e) permits a court to depart below a statutory mandatory minimum only for a defendant's substantial assistance to the government, which means that variances and non-5K1.1 departures may not result in the imposition of a sentence below the statutory mandatory minimum, see 18 U.S.C. § 3553(f).  The Court will, however, grant the Downward Departure Motion and vary Nolf's sentence downward to the extent that it can -- three months -- to the statutory mandatory minimum of 60 months.

## FACTUAL BACKGROUND

The Court will take its facts primarily from the Presentence Investigation Report ("PSR") that United States Probation Officer Jeffrey D. Martinez-Spelich prepared, which summarizes information "obtained from discovery material contained in the United States Attorney file as reported by United State Immigration and Customs Enforcement agents, Quay County, New Mexico Sherriff's deputies, and New Mexico State Police officers."  PSR ¶ 4, at 3.

1.      **The Offense of Conviction.**

On April 26, 2010, the Air and Marine Operations Center ("AMOC") detected an unidentified aircraft traveling across Arizona and into New Mexico. <u>See</u> PSR ¶ 5, at 3. AMOC planned to dispatch a plane to intercept the unknown aircraft, but AMOC's tracking of the unknown aircraft was lost. <u>See</u> PSR ¶ 5, at 3. The unknown aircraft was later located over Grants, New Mexico, and then descending into Santa Rosa, New Mexico, en route to the Route 66 Airport. <u>See</u> PSR ¶ 5, at 3. AMOC notified the Santa Rosa Police Department ("SRPD") of the unknown aircraft. <u>See</u> PSR ¶ 5, at 3.

SRPD arrived at the airport and observed the unknown aircraft, as AMOC had identified, parked there. <u>See</u> PSR ¶ 6, at 3. SRPD officers headed toward the vehicle, but a passenger, later identified as Nolf, saw the officers, appeared to inform the pilot, later identified as co-Defendant Sean Peterson, of the SRPD officers' approach. <u>See</u> PSR ¶ 6, at 3. Nolf and Peterson then engaged the aircraft and headed for the airstrip; SRPD officers noted the tail number on the aircraft. <u>See</u> PSR ¶ 6, at 3. The aircraft evaded the SRPD officers and took off, and appeared to be heading toward Tucumcari, New Mexico. <u>See</u> PSR ¶ 6, at 3-4.

Later, Gerald Hight, a ranch owner in Tucumcari, observed a low-flying aircraft circling his residence. <u>See</u> PSR ¶ 7, at 4. The aircraft appeared to be attempting a landing on New Mexico State Highway 209, but finally landed in Hight's pasture. <u>See</u> PSR ¶ 7, at 4. Hight drove to the landing site with his son, and saw Nolf and Peterson unloading duffle bags from the aircraft. <u>See</u> PSR ¶ 7, at 4. When Nolf and Peterson saw the Hights, they began to put the duffle bags back into the aircraft. <u>See</u> PSR ¶ 7, at 4. The Defendants said they were uninjured, and told Hight that they did not need to call 911 or the Federal Aviation Administration. <u>See</u> PSR ¶ 7, at 4. Hight offered to take the Defendants to Tucumcari for lodging, and on the way there, Hight

overhead one of the Defendants state that they "were not going to make it to New Orleans tonight." PSR ¶ 7, at 4. Hight took the Defendants to the Holiday Inn in Tucumcari, but Hight then saw the Defendants leave the Holiday Inn and enter the Microtel Inn Hotel. See PSR ¶ 7, at 4.

Hight found the Defendants' behavior suspicious and reported the incident to the New Mexico Sheriff's Department in Quay County. See PSR ¶¶ 7-8, at 4. When deputies arrived at the Microtel Inn, they found Peterson, but not Nolf. See PSR ¶ 7, 9, at 4. When questioned, Peterson stated that he did not know anything about the landing. See PSR ¶ 9, at 4. The Sheriff's Department called the New Mexico State Police ("NMSP") regarding the aircraft landing, and NMSP officers arrived at the Microtel Inn to investigate. See PSR ¶ 9, at 4. Peterson would not provide a statement without an attorney. See PSR ¶ 9, at 4. The NMSP officers read Peterson his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and transported him to the NMSP Office in Tucumcari. See PSR ¶ 9, at 4. The hotel staff informed the Sheriff's deputies that Nolf had left before the Sheriff's deputies arrived, and the staff provided the officers with a copy of Nolf's identification, but officers could not locate Nolf. See PSR ¶ 9, at 4. Because the officers could not obtain a search warrant and were not able to classify the landing as a crash or emergency landing, Peterson was released on April 27, 2010. See PSR ¶ 9, at 4.

Later on April 27, 2010, the NMSP officers obtained a search warrant and searched the aircraft, finding 377.5 pounds of marijuana inside large black duffle bags in the aircraft. See PSR ¶ 10, at 5. Two additional duffle bags were found in the vicinity, which, combined with the marijuana inside the aircraft, totaled 424.8 pounds of marijuana. See PSR ¶ 10, at 5. The aircraft was damaged from the landing. See PSR ¶ 10, at 5. An investigation into the aircraft

revealed that Nolf was listed as the owner, and that Peterson had a valid pilot's license.  See PSR ¶ 11, at 5.

Federal arrest warrants were issued for Nolf and Peterson on May 10, 2010.  See PSR ¶ 12, at 5.  The Criminal Complaint as to Nolf alleges that his actions violate 21 U.S.C. § 846, conspiracy to commit a violation of 21 U.S.C. § 841(a)(1), for having "[k]nowingly and willingly conspire[d] to distribute over 100 kilograms or more of a mixture or substance containing a detectible amount of marijuana, a controlled substance."  Criminal Complaint at 1, filed May 10, 2010 (Doc. 1).

### 2.      **Offender Characteristics.**

Nolf has been convicted on three occasions before this incident, two of which included felony convictions.  On July 10, 2000, Nolf was convicted of misdemeanor possession of drug paraphernalia and cited for not driving without proof of insurance; he was sentenced to one day of jail.  See PSR ¶ 34, at 10.  On December 8, 2000, Nolf pled guilty to felony possession of marijuana for sale in Maricopa County, Arizona, and sentenced to six months jail time and five years of supervised probation, as well as community service and a fine.  See PSR ¶ 33, at 9.  On that occasion, Nolf was caught with 9.1 kilograms of marijuana that he was attempting to ship to Chicago, Illinois.  See PSR ¶ 33, at 10.  On October 1, 2004, Nolf was convicted of aggravated assault for "point[ing] a semi-automatic handgun out of the window [of his truck] and aim[ing it] at [another motorist's] face."  PSR ¶ 35, at 11.  His probation from the previous conviction was revoked for one year, and he was sentenced to an additional two-and-a-half years of incarceration.  See PSR 33, at 9-10; id. ¶ 35, at 11.  Nolf thus has a total of six criminal history points, which would place him in criminal history category III, see U.S.S.G. § 5A, but because he meets the criteria of the career offender enhancement, he is automatically placed into category

VI, see PSR ¶ 36, at 11; U.S.S.G. § 4B1.1(a)-(b).   Additionally, there were two active Drug Enforcement Administration investigations relating to narcotics pending as to Nolf at the time of the offense.  See PSR ¶ 11, at 5.

Nolf was 32 years old at the time of his arrest.  See PSR ¶ 38, at 12.  He was raised in Tucson, Arizona, the only child of a single mother, Miki Nolf, who works as a mail-carrier.  See PSR ¶ 38-40, at 12.   Nolf was an angry, rebellious child with a friendless, fatherless, and alienated upbringing.  See PSR ¶ 39, at 12.  He has always had, however, a "supportive and nurturing" relationship with his mother, who, sadly, suffers from severe depression, as well as severe neck and back pain that affects her work and for which she takes pain medication.  See PSR ¶ 38-39, at 12.  His mother attempted suicide on two occasions during his childhood, when he was twelve and fourteen years old, and on one of the occasions, "Nolf actually found his mother unconscious, tried to pump out her stomach, called an ambulance, and had her admitted to a psychiatric facility."  First Nolf Brief at 22.  Nolf lives in Phoenix with his common-law wife, Lori Nash, a fully-employed makeup artist for Neiman Marcus, and three-year-old daughter, Kaylee.  See PSR ¶ 43, at 13.  By all accounts, Nolf is a "loving and supportive . . . [,] caring, nurturing . . . [,] 'wonderful'" husband and father.  PSR ¶ 45, at 13.  He is generally healthy except for depression, anxiety, insomnia, and high blood pressure brought on by his incarceration, see PSR ¶¶ 54-58, at 15, uses no drugs other than marijuana, which he uses extensively, see PSR ¶¶ 59-62, at 15-16, and dropped out of the College of Engineering at the University of Arizona after graduating high school in the top ten percent of his class, see PSR ¶ 63-64, at 16.

## PROCEDURAL BACKGROUND

Nolf pled guilty to violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B), possession of 100 kilograms or more of marijuana with intent to distribute, and 21 U.S.C. § 846, conspiracy to do the same, pursuant to a plea agreement with Plaintiff United States of America.  See Plea Agreement, filed July 13, 2011 (Doc. 109).  The Plea Agreement stipulated that Nolf was entitled to the 3-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.  See Plea Agreement ¶ 9(b), at 4-5.  The United States later filed a motion pursuant to U.S.S.G. § 5K1.1, asking the Court for a 12-level downward departure in offense level to compensate for substantial assistance that Nolf provided to the United States with regard to other criminal investigations.  See Downward Departure Motion at 2.

The PSR posits that Nolf would, but for the career offender provision in U.S.S.G. § 4B1.1, be sentenced at an offense level of 23 -- reflecting a base level of 26 pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(7) -- but that because he meets the criteria of the career offender provision, his offense level is adjusted to 34, the stock offense level for crimes carrying a maximum sentence of more than 25 years but less than life imprisonment.  See PSR ¶¶ 23-29, at 7-9.  The PSR states that Nolf is then entitled to a 3-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 and that his final offense level is 31.  See PSR ¶¶ 30-31, at 9.  Given that career offenders are automatically assigned a criminal history category of VI, see PSR ¶ 36, at 11, the PSR calculates a Guidelines sentencing range of 188-235 months, see PSR ¶ 81, at 21.  The PSR further states that Nolf is ineligible for probation.  See PSR ¶ 85, at 21.

Nolf raises three broad objections to the PSR: (i) that the Court should not apply the career offender provision to Nolf; (ii) that Nolf is entitled to a downward variance on the ground

of diminished capacity; (iii) that Nolf is entitled to a downward variance based on his having been attacked in jail as a result of his decision to assist the government; and (iv) that the Court should apply variances before applying the § 5K1.1 downward departure, rather than conforming to the usual three-step sequence.  The United States opposes each of these contentions, but has no objections of its own to the PSR.

       1.      **Nolf Argues That the Career Offender Adjustment Should Not Apply to Him, and the United States Disagrees Without Elaboration.**

By far, Nolf's most robust argument -- the vast majority of the First Nolf Brief -- is devoted to attacking the Guidelines' career offender provision, both conceptually and, to a much lesser extent, as applied to Nolf's situation.  <u>See</u> First Nolf Brief at 1-22.  The United States notes that much of this argument "appears to be a boilerplate motion crafted by the Public Defender's Office," and correctly points out that the brief "does not even discuss Mr. Nolf or the instant offense specifically until page 19."  First U.S. Brief at 2.

The crux of Nolf's argument is that "[t]he sentencing court must select a sentence 'sufficient but not greater than necessary' to achieve the sentencing goals of 18 U.S.C. § 3553(a)," and that "[s]entences recommended by the career offender guideline are among the most severe and least likely to promote sentencing purposes."  First Nolf Brief at 1 (quoting <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007)).  Nolf asserts that the career offender guideline, unlike the rest of the Guidelines, "is not the product of careful study, empirical research, or national experience," but rather is "keyed to the statutory maximum [as a] result of a congressional directive."  First Nolf Brief at 2.  Nolf asked the Court to refuse to apply the career offender guideline, arguing that post-<u>United States v. Booker</u>, 543 U.S. 220 (2005), the district courts "'may vary [from guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'"  First Nolf Brief at 2 (alteration in original)(quoting

Kimbrough v. United States, 552 U.S. at 101).  He asserts that such a variance is particularly appropriate when -- as he contends is the case with the career offender provision -- "the Commission did not act in 'the exercise of its characteristic institutional role,' i.e., did not base a guideline on 'empirical data and national experience.'"  First Nolf Brief at 2 (emphasis added)(quoting Kimbrough v. United States, 552 U.S. at 109).  Nolf further suggests that the Court could decline to apply the career offender guidelines without fear of reversal on appeal, noting that: (i) "the courts of appeals may not 'grant greater factfinding leeway to [the Commission] than to [the] district judge," First Nolf Brief at 2 (quoting Rita v. United States, 551 U.S. 338, 347 (2007)); and (ii) appellate courts have affirmed other judges who "embraced this invitation," First Nolf Brief at 2.  See First Nolf Brief at 2 n.2 (citing, e.g., United States v. Corner, 598 F.3d 411 (7th Cir. 2010)).

Nolf next identifies the statutory directive that led to the promulgation of the career offender guidelines, 28 U.S.C. § 994(h).  See First Nolf Brief at 4.  Nolf does not deny the strong similarity between the statutory directive and the resultant guideline, but notes that "Congress expressly chose to make § 994(h) a directive to the Commission, rather than a sentencing mandate to the courts."  First Nolf Brief at 4.  Nolf then contrasts the Commission's normal process for promulgating the Guidelines -- consisting of empirical research on current sentencing and recidivism trends, coupled with feedback from judges, prosecutors, public defenders, and other participants in the judicial system -- with the process it used to create the career offender guideline, which Nolf asserts consisted of simply implementing Congress' directive without any empirical research or feedback.  See First Nolf Brief at 5-9.

Beyond simply not being the result of careful empirical study, Nolf positively asserts that the career offender guideline is "empirically unsound."  First Nolf Brief at 9.  Nolf analyzes four

sentencing factors: (i) incapacitation, asserting that while true criminal history category VI offenders have a recidivism rate of 55% within two years of their release, career offenders based on drug offenses have only a 27% rate, which "'more closely resembles the rates for offenders in lower criminal history categories in which they would be placed under the normal criminal history scoring rules,'" First Nolf Brief at 10 (quoting U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform at 133-34 (2004)); (ii) deterrence, asserting that "empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects,'" First Nolf Brief at 11 (quoting Michael Tonry, Purposes and Functions of Sentencing 34 Crime and Justice: A Review of Research 28-29 (2006)); (iii) just deserts and respect for the law, positing that, "[a]ccording to a public opinion survey conducted on behalf of the Commission in 1997, there was little support for sentences consistent with most habitual offender legislation," First Nolf Brief at 13; and (iv) avoidance of unwarranted sentencing disparities, arguing that the career offender guideline leads to both unwarranted disparity, but also unwarranted uniformity, i.e., "the career offender guideline 'makes no distinction between defendants convicted of the same offenses, either as to the seriousness of their instant offense or their previous convictions," First Nolf Brief at 13.

Nolf asserts that "[j]udges often depart or vary when the defendant is a career offender based on prior drug convictions," First Nolf Brief at 17 (citing United States v. Malone, 2008 WL 6155217 (E.D. Mich. Feb. 22, 2008)(unpublished)), and asks the Court to decline sentencing Nolf as a career offender, see First Nolf Brief at 19.  Nolf asserts that his aggravated assault conviction involved a case in which -- after his earlier felony marijuana conviction -- he was

seen by a passing motorist in his car with a gun in his hand.  See First Nolf Brief at 20.  Nolf asserts that the transcript of the plea colloquy clearly shows that he did not point the gun at anyone, but that he pled guilty to the charge to avoid a felon-in-possession-of-a-weapon charge. See First Nolf Brief at 20-21.  Nolf further notes he has only two prior felony convictions, the minimum needed to trigger the career offender provision, and that his convictions relate to offenses committed ten and twelve years ago.  See First Nolf Brief at 21.

The United States refuses to address Nolf's argument, noting that it "will address Defendant's arguments as they relate[] to Mr. Nolf and his conduct, and will not address this scripted attack on the Guidelines."  First U.S. Brief at 2.

Neither side elaborated on this argument at the hearing.  See Transcript of Hearing at 3:12-5:8 (Padilla), taken November 20, 2012 ("2012 Tr.");[2] 2012 Tr. at 7:2-8:12 (Ganjei).  The Court indicated its opinion that it "do[es]n't have any sort of fundamental disagreement with the career enhancement from an empirical or data standpoint.  I know that defendants have raised similar arguments in the past, [but] I don't have [any] Kimbrough disagreement with the guideline."  2012 Tr. at 10:25-11:4 (Court).

## 2. Nolf Argues That He Is Entitled to a Variance for Diminished Capacity, and the United States Disagrees.

Nolf hired Dr. Elliott J. Rapoport to conduct a psychological evaluation of him.  See First Nolf Brief at 22.  Much of what Dr. Rapoport reports matches the information in the PSR. Compare First Nolf Brief at 22-24 with PSR ¶¶ 38-62, at 12-16.  Dr. Rapoport asserts that Nolf "has struggled with mental health issues from a very early age."  First Nolf Brief at 22. Dr. Rapoport notes that Nolf never had a father present and, although he was and is very close to

_____

[2] The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

his mother, his mother suffered from serious mental health problems that culminated in two

suicide attempts, first when Nolf was twelve years old, and then again when he was fourteen

years old.  See First Nolf Brief at 22.  On one of the occasions, "Nolf actually found his mother

unconscious, tried to pump out her stomach, called an ambulance, and had her admitted to a

psychiatric facility."  First Nolf Brief at 22.  Dr. Rapoport opines that Nolf was not malingering

and diagnosed him with Bipolar I Disorder, noting that his "depression [i]s severe in magnitude[,

but] without psychotic features."  First Nolf Brief at 22-23.  Dr. Rapoport asserts that Nolf self-

medicates with marijuana to "deal with his lifelong struggles with anxiety and depression."  First

Nolf Brief at 23.  Furthermore, Dr. Rapoport

> believes that the Bipolar I Disorder diagnosis is critical to understanding
> Mr. Nolf's behavior at the time he committed the instant offense.  During the
> period immediately prior to committing the instant offense, Mr. Nolf's overall
> financial and person situation had become progressively more and more
> untenable.  As the economic situation became more desperate, Dr. Rapoport
> believes that Mr. Nolf responded with a mixture of anxiety and depression which
> effectively precluded the use of even reasonably good judgment.  Dr. Rapoport
> believes that Mr. Nolf engaged in the illegal conduct at least partially because of
> his mental health disabilities.  Finally, Dr. Rapoport suggests to the Court in his
> report that the Court consider diminished capacity as a basis for a downward
> departure at sentencing.

First Nolf Brief at 23-24.

The United States objects to Nolf's request for a variance on the grounds of diminished

capacity, arguing that it "is entitled to cross-examine Dr. Rapoport as to his methodology, the

basis for his conclusions, and the overall extent of his interactions with Defendant."  First U.S.

Brief at 5-6.  The United States asserts that it "has met and interviewed with Defendant, and in

no way did Defendant appear to suffer from any severe depression, bipolar disorder, or otherwise

exhibit an diminished capacity."  First U.S. Brief at 6.  The United States implies that Nolf is

malingering so as to receive the requested variance:

> It is rather convenient for Defendant that such information is being raised now, at sentencing, for the first time, rather than at the time when the United States was evaluating Defendant's suitability as a cooperator.  Certainly such information would have been valuable for the United States to know when determining whether Defendant would be a competent witness at trial.

First U.S. Brief at 6.

The United States also "object[s] to Dr. Rapoport's actual advocacy of a reduced sentence," alleging that it "underscores his bias in the instant proceedings."  First U.S. Brief at 6.  The United States further asserts that Rapoport's "unmasked advocacy . . . undermines his overall credibility."  First U.S. Brief at 6.

Last, the United States asserts that, "according to Defendant's own doctor, Defendant is of above-average intelligence, ranking in the 77th percentile overall."  First U.S. Brief at 6.  The United States contends that the scope, success, and sophistication of Nolf's criminal enterprise -- as well as his legitimate business enterprise (a custom car business) -- undermines his claim of diminished capacity.  See First U.S. Brief at 6.

At the first hearing, the Court indicated -- without much elaboration from the parties -- that it was inclined to grant a variance on the basis of Nolf's personal characteristics and Dr. Rapoport's report, but that it thought it could only vary Nolf's sentence from the 63-78 month Guidelines range down to the 60-month statutory minimum.  See 2012 Tr. at 19:2-20:4 (Court).

**3.    Nolf Argues That He Is Entitled to a Variance Because He Was Attacked in Jail as a Result of His Decision to Assist the United States, and the United States Presumably Disagrees.**

Nolf briefly argues for a downward variance -- or an additional § 5K1.1 departure -- on the basis of hardships endured as a result of his cooperation with the United States.  See First Nolf Brief at 24-26.  He argues that

> [t]he Court should also take into consideration the consequences that Mr. Nolf has already experienced while detained awaiting sentencing.   While Mr. Nolf was detained at the Torrance County Detention Center, along with his codefendant, Sean Peterson, defense counsel alerted the U.S. Marshal's Office and requested that Mr. Nolf and Mr. Peterson be confined in different jails.   Unfortunately the two codefendants were not moved out of the same facility until after Mr. Nolf was brutally attacked in his pod by approximately ten other inmates based on his decision to cooperate with the government. . . .   Any additional incarceration is likely to include threats of violence to Mr. Nolf as a consequence of his cooperation.

First Nolf Brief at 25.

The United States does not address this request in its briefing, but its repeated requests for a sentence of 63-78 months -- the Guidelines range after the application of United States' § 5K1.1 departure -- indicates that they oppose any additional variance or departure.   The United States asserts, however, that while the assistance Nolf provided was useful, it "has some reservations as to the accuracy of [some of his] information" and that it does not merit any benefits beyond the requested 12-level departure.   First U.S. Brief at 2-3.

This issue was not addressed at either hearing in the context of a variance or additional departure, but the Court had an exchange with Nolf, personally, and with Probation about the possibility of a recommendation that Nolf serve his time at a low-security facility away from the people who had attacked him and close to his family.   See Transcript of Hearing at 12:15-13:24 (Court, Probation Officer, Nolf, Padilla), taken July 17, 2013 ("2013 Tr.").

### 4.     Nolf Argues That the Court Should Apply Any Variances Before Applying the § 5K1.1 Downward Departure.

The Court held a hearing after the submission of the Downward Departure Motion, the First Nolf Brief, and the First U.S. Brief, and indicated that, while it was inclined to grant Nolf a downward variance, it would apply the career offender guideline.   See 2012 Tr. at 10:25-11:4 (Court); id. at 19:2-20:4 (Court).   The majority of that hearing, however, was spent discussing

- 14 -

whether the Court could grant the variance that Nolf seeks.  Because the Guidelines range, after the application of the § 5K1.1 departure, is 63-78 months, the Court questioned whether its authority to depart downward was limited to 3 months pursuant to the five-year (60-month) statutory mandatory minimum in 21 U.S.C. § 841(b)(1)(B).  See 2012 Tr. at 11:10-20:4 (Court, Padilla, Ganjei).  The United States indicated that it believed the Court could not sentence Nolf below the mandatory minimum, see 2012 Tr. at 16:17-17:14 (Ganjei), and the USPO indicated that "[t]he guidelines don't indicate as to which departure you can pick first[, but] we would recommend probably the highest one that creates the most benefit for the defendant," 2012 Tr. at 14:11-14 (Probation Officer).  The Court stated that it would allow Nolf to brief the issue, but it was inclined to think that it must apply the § 5K1.1 departure first, and if that limited the available space above the statutory minimum to vary, then the defendant would simply not get the full benefit of the entire variance.  See 2012 Tr. at 20:5-14 (Court).

The next round of briefing therefore focuses on Nolf's new argument: that the Court should apply the variances first, and then apply the § 5K1.1 departure, thus permitting the Court to impose a sentence below the statutory mandatory minimum of five years, see 21 U.S.C. § 841(b)(1)(B), pursuant to 18 U.S.C. § 3553(e).  See Second Nolf Brief; Second U.S. Brief.

Nolf argues that "[c]ommon sense, sound public policy, United States v. Booker, 543 U.S. 200 (2005) and its progeny, 18 U.S.S.C. [sic] § 3553(e) and 18 U.S.C. § 3553(a), all support a sentencing court's consideration of a § 3553(a) variance request before determining the extent of a substantial assistance downward departure."  Second Nolf Brief ¶ 3, at 3.  Nolf contends that the three-step sequence renders courts "unable to fully take into account mitigating non-guidelines-range § 3553(a) factors," and, in this case, would limit the Court to three months of variance.  Second Nolf Brief ¶ 4, at 4.  Nolf asserts that "limiting or even precluding the

consideration of the mitigating effects of non-guideline-range § 3553(a) factors violates *Booker* and its progeny," because "'a sentence above a statutory minimum [must] be governed by § 3553(a) as a whole, not only by the sentencing guidelines.'"  Second Nolf Brief ¶ 5, at 4-5.

Nolf also argues that following the three-step sequence "contravenes § 3553(a)'s requirement that the district court impose a sentence no greater than necessary to achieve the sentencing purposes of § 3553(a)(2)."  Second Nolf Brief ¶ 6, at 5.  Nolf also asserts that the three-step sequence specifically "disadvantage[s] defendants who cooperate with the government," Second Nolf Brief ¶ 7, at 6 (citing United States v. A.B., 529 F.3d 1275, 1287 n.16 (10th Cir. 2008)), because "[t]hose [defendants] with guideline ranges above the mandatory minimum 'who provided no cooperation would be eligible to receive downward variances to the mandatory minimum, but those who cooperated and received substantial assistance downward departures would not.'"  Second Nolf Brief ¶ 7, at 6 (quoting United States v. A.B., 529 F.3d at 1287 n.16).

Nolf further contends that rigid application of the three-step sequence "would create an irrational disparity between those who assist the government before sentencing and those who do so after sentencing,"  Second Nolf Brief ¶ 8, at 6 (citing United States v. Coyle, 506 F.3d 680, 683-84 (8th Cir. 2007)), because, while

> [a] defendant who did not cooperate before sentencing could receive all the variance he or she deserved down to the mandatory minimum and then cooperate after sentencing and receive whatever downward departure was warranted pursuant to Federal Rule of Criminal Procedure 35(b) . . . , a defendant with the same pre-departure guideline range who cooperated before sentencing would be deprived of a variance and the substantial-assistance departure would begin from the bottom of the range above the mandatory minimum, instead of from a post-variance level,"

Second Nolf Brief ¶ 8, at 6.  Nolf concludes that this alleged anomaly creates "a counterproductive incentive to cooperate later rather than sooner."  Second Nolf Brief ¶ 8, at 6.

- 16 -

Nolf last argues that the United States Court of Appeals for the Eighth Circuit has expressly authorized deviation from the three-step sequence, see Second Nolf Brief ¶ 9, at 7 (citing United States v. Coyle, 506 F.3d 680, 683-84), and that the Tenth Circuit has, "'at most,'" said that "'a district court generally follows a three-step process,'" Second Nolf Brief ¶ 10, at 7 (quoting United States v. Lopez-Macias, 661 F.3d 485, 488 n.1 (10th Cir. 2011)).

The United States counters this argument by pointing to United States v. A.B., which it contends declined a proposition identical to the one that Nolf now poses.  See Second U.S. Brief at 3.  The United States contends that the Tenth Circuit "looked to" the United States Court of Appeals for the First Circuit's holding in United States v. Ahlers, 305 F.3d 54 (1st Cir. 2002), concluding that, in the First Circuit, "'upon granting a § 3553(e) downward departure, a district court is not at liberty to treat the case "like any other," but rather must focus only on substantial assistance considerations.'"  Second U.S. Brief at 4 (quoting United States v. A.B., 529 F.3d at 1284).

At the second hearing, the parties reiterated their arguments, and the Court indicated that it was inclined to sentence Nolf to 60 months imprisonment, which it concluded was the lowest sentence it could lawfully impose.  See Tr. at 28:11-13 (Court)("No I don't think I have authority [to apply variances such that Nolf's sentence drops below the statutory minimum].").

## LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, thus making the Guidelines effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they

- 17 -

have in the past, in determining whether a sentence is unreasonable."  <u>United States v. Booker</u>,

543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C.

§ 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to
> provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).  Section 3551 provides that

> a defendant who has been found guilty of an offense described in any Federal
> statute . . . shall be sentenced in accordance with the provisions of this chapter so
> as to achieve the purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of
> the case.

18 U.S.C. § 3551.

To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available

sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar

crimes; and (v) the need to provide restitution to victims.  <u>See</u> 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the

United States Court of Appeals for the Tenth Circuit have clarified that, because the Guidelines

are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considered.

<u>See</u> <u>Rita v. United States</u>, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact

that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  The Guidelines are significant, because they "are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotations omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  "This presumption, however, is an appellate presumption, not one that the trial court can or should apply."  United States v. Chatto, No. CR 06-2561 JB, 2008 WL 4107149 (D.N.M. May 12, 2008)(Browning, J.).  See Rita v. United States, 551 U.S. at 347-48; Gall v. United States, 552 U.S. 38, 40 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory Guideline sentence.  See Rita v. United States, 551 U.S. at 347-48; Gall v. United States, 552 U.S. at 40; Kimbrough v. United States, 552 U.S. at 90-91.

## ANALYSIS

The Court will sentence Nolf to a 60-month term of imprisonment.  It arrives at this figure by: (i) applying the Guidelines' career offender offense level of 34; (ii) adjusting 3 levels downward for acceptance of responsibility; (iii) granting the Downward Departure Motion  and

departing 12 levels downward for substantial assistance to the government; and (iv) varying downward -- from the Guidelines' prescribed sentence of 63-78 months -- by 3 months to, but not below, the statutory minimum sentence.

Federal sentencing is controlled at the statutory level by the general federal sentencing statute, 18 U.S.C. § 3553, as well as by the specific United States Code provision(s) under which the defendant is convicted: here, 21 U.S.C. § 841(a)(1), (b)(1)(B), for the substantive drug dealing count; and 21 U.S.C. § 846, for the conspiracy.  The statute of conviction typically provides only a maximum sentence and, less commonly, a mandatory minimum sentence, although statute-specific fines and provisions relating to supervised release are not unheard-of.[3] Nolf's statutes of conviction each provide for a sentence of "a term of imprisonment which may not be less than 5 years and not more than 40 years."[4]  21 U.S.C. § 841(b)(1)(B)(viii).

Section 3553 addresses how the federal district courts should approach sentencing. Subsection (a) of § 3553 outlines the "factors to be considered in imposing a sentence,"

---

[3] For example, Nolf's crime of conviction provides that "any sentence imposed under this subparagraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment."   21 U.S.C. § 841(b)(1)(B)(viii).

[4] Penalties for drug conspiracies mirror those for commission of the substantive offense. See 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.").

Had Nolf gone to trial he would have been subject to much worse penalties, because his prior felony drug conviction would trigger a statutory sentence enhancement.  "If any person commits . . . a violation [of § 841(b)(1)(B)] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment."  21 U.S.C. § 841(b)(1)(B)(viii).  To trigger this enhancement, however, the prior conviction must be established, before the trial or guilty plea, by the United States filing an information with the Court that the defendant could then affirm or deny.  See 21 U.S.C. § 851(a)(1).  The United States uses the discretion it has whether to file this information as a way to exercise leverage over the defendant in the plea-bargaining process.

including: (i) the criminal history of the defendant; (ii) the seriousness of the crime, taking into account the need for punishment, deterrence, protection of the public, and rehabilitation; (iii) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (iv) the range of sentences that the United States Sentencing Guidelines[5] and the contained policy statements suggest.  18 U.S.C. § 3553(a) (title case omitted).  This subsection specifically directs district courts to "impose a sentence sufficient, but not greater than necessary, to comply with the [following] purposes" -- deterrence, rehabilitation, protection of the public, just punishment, and the promotion of respect for law -- which the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court of the United States, has called "the fundamental criteria governing penology."  18 U.S.C. § 3553(a); United States v. Booker, 543 U.S. 220, 305 (2005)(Scalia, J., dissenting).  Subsection (b) purports to provide that the Sentencing Guidelines are mandatory and binding upon judges; the Supreme Court ruled this provision unconstitutional in United States v. Booker, 543 U.S. 220. Subsections (e) and (f) give judges narrowly circumscribed authority to impose sentences below the statutory mandatory minimum: subsection (e) applies only when the prosecution moves for a downward departure because the defendant has provided them with substantial assistance in another investigation; subsection (f), the so-called safety valve provision, allows judges to discretionarily sentence below the minimum when certain conditions are met, including that the defendant has fewer than two criminal history points -- a condition which prevents Nolf from being able to get the benefit of the safety valve.

---

[5] The Sentencing Guidelines are promulgated by the U.S. Sentencing Commission pursuant to its establishment and investiture of authority in Chapter 58 of Title 28 of the U.S. Code.  See 28 U.S.C. § 991-998.

The next level of authority to which judges must look is the Guidelines.  Even though United States v. Booker excised subsection (b) from the sentencing statute, the Guidelines' suggested range remains as one of the factors enumerated in subsection (a).  See United States v. Booker, 543 U.S. 220.  The result of this express listing is that the Guidelines remain in force in an advisory role, and district judges must continue to apply them, even if after doing so they will vary from the result that the Guidelines dictate.  543 U.S. at 264.  The Guidelines attempt to map every conceivable criminal offense by every conceivable criminal on a grid: columns I through VI represent the severity of the offender's criminal history; rows 1 through 43 represent the severity of the crime before the court, the "offense level"; and the cell on the grid that matches the offender's criminal history category and offense level contains a range of months to which the Guidelines direct the judge to sentence the offender.  See U.S.S.G. § 5A.  Now, post-United States v. Booker, the Guidelines direct district judges that, after performing the Guidelines calculation, they may "vary" from the prescribed sentence range on the basis of their "consider[ation of] the applicable factors in 18 U.S.C. § 3553(a) taken as a whole."  U.S.S.G. § 1B1.1(c).

Both issues Nolf raises, but especially the second one, implicate the proper order for applying various adjustments, departures, and variances.  The order of application matters: certain Guidelines provisions, such as the career offender provision at play here, intentionally subsume others; and, when, as here, the statutory mandatory minimum is in play, there is only one change[6] -- the downward departure for substantial assistance to the government under U.S.S.G. § 5K1.1 -- that empowers the Court to break through the statutory floor and sentence

_____

[6] The safety-valve provision also permits courts to sentence below the statutory minimum, but Nolf does not qualify for the safety-valve, because of his prior criminal history. See 18 U.S.C. § 3553(f).

the defendant to a term below the minimum.   See 18 U.S.C. § 3553(e).   If the downward departure for substantial assistance is applied first, there might not be much room left to apply other downward deviations before hitting the statutory minimum.   If the downward departure is applied last, then the defendant gets the full benefit of the other downward changes that properly apply to him (provided those changes do not, on their own, take the sentence below the statutory minimum), but then it is hard to see how Congress' express intent in § 3553(e) is being effectuated.   Taking into account § 3553(e)'s mandate, the explicit directive of the Guidelines, and existing Tenth Circuit case law, the Court determines that the downward departure for substantial assistance must be applied in the order that the Guidelines contemplate: after the changes of chapters 1 through 4 of the Guidelines, but before any variances not covered by the Guidelines.

Nolf's first issue challenges the Guidelines' career offender category, possibly on its face, but certainly as applied to Nolf.   Nolf argues, and the Court accepts, that the Sentencing Commission did not promulgate the career offender provision purely pursuant to its general congressional mandate to codify then-existing sentencing tendencies into a comprehensive, consistent, and empirically supported set of Guidelines.   See 28 U.S.C. § 994.   The career offender provision was created pursuant to -- or at least in light of -- a separate statutory provision, 28 U.S.C. § 994(h), that left the Commission little discretion: Congress directed the Commission to create the career offender provision; Congress described the exact terms and conditions it wanted in the provision; and the Commission carried out Congress' will.   Nolf does not dispute that the Commission was obedient to Congress' dictate, but argues that, because § 994(h) is a directive to the Commission, not a sentencing statute to be applied directly by district judges like § 3553, district judges are free to ignore it.   The Court disagrees.   Congress'

intent in enacting § 994(h) could not have been clearer: it wanted the career offender provision, and it wanted it in the exact form that U.S.S.G. § 4B1.1 now provides it.  That Congress was not speaking directly to district judges in § 994(h) seems especially trivial when one realizes that, when Congress passed § 994, it did so under the belief that the Guidelines would be mandatory.

I.   **THE COURT WILL APPLY THE CAREER OFFENDER GUIDELINE TO NOLF, BECAUSE THE PROVISION REFLECTS CONGRESS' <u>UNMISTAKABLY CLEAR INTENT, EVINCED IN 28 U.S.C. § 994(h).</u>**

To properly calculate Nolf's Guidelines sentence range, the Court must apply the career offender guideline to Nolf.  The career offender guideline: (i) inarguably applies to Nolf; (ii) was properly fashioned pursuant to a clear and direct congressional mandate, 28 U.S.C. § 994(h); and (iii) was intended to be binding upon district judges, albeit indirectly, because when Congress directed the Sentencing Commission to create the career offender guideline, the Guidelines were still mandatory.  Although the Court may counteract the effects of what it considers to be an unfair application of the Guidelines by varying from their suggested sentencing range, the proper time to do so is after first calculating the proper Guidelines range.

The career offender guideline provides as follows:

<u>Career Offender</u>

(a)   A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

(b)   Except as provided in subsection (c), if the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply. A career offender's criminal history category in every case under this subsection shall be Category VI.

| Offense Statutory Maximum | | Offense Level |
|---|---|---|
| (1) | Life | 37 |
| (2) | 25 years or more | 34 |
| (3) | 20 years or more, but less than 25 years | 32 |
| (4) | 15 years or more, but less than 20 years | 29 |
| (5) | 10 years or more, but less than 15 years | 24 |
| (6) | 5 years or more, but less than 10 years | 17 |
| (7) | More than 1 year, but less than 5 years | 12 |

*If an adjustment from § 3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.

U.S.S.G. § 4B1.1 (emphasis omitted).  Nolf plainly satisfies the criteria of § 4B1.1(a): he was thirty-two years old when he committed the crime; the crime of conviction here is a controlled substance felony; and Nolf has been convicted twice before of felonies involving either controlled substances or violence -- namely, his 2000 felony possession of marijuana for sale conviction and his 2004 aggravated assault conviction.[7]  As such, Nolf does not dispute the mechanical applicability of the career offender guideline to his case, but rather attacks the guideline itself.

In 1984, Congress passed the Sentencing Reform Act -- the law that established the Sentencing Commission, authorized the creation of the Guidelines, and enacted § 3553 -- with the express provision that the resulting Guidelines would be mandatory for district courts to follow.  See Pub. L. No. 98-473, 98 Stat. 1976.  Congress' broad directive to the Commission

---

[7] The Guidelines explicitly provide that aggravated assault is a "crime of violence." U.S.S.G. § 4B1.2 cmt. 1 ("'Crime of violence' includes . . . aggravated assault . . . ."). The Guidelines define a "controlled substance offense" as any "offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b). The statute of Nolf's 2000 conviction, Ariz. Rev. Stat. § 13-3405(A)(2), provides that "[a] person shall not knowingly . . . [p]ossess marijuana for sale."

was to promulgate Guidelines that "provide[] certainty and fairness in sentencing and reduc[e] unwarranted sentence disparities," 28 U.S.C. § 994(f), by "develop[ing] means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing," 28 U.S.C. § 991(b)(2).  Congress' expectation was not necessarily to alter the average sentences then imposed, either generally or for any particular crime, but rather to increase uniformity of sentencing.  See 28 U.S.C. § 994(m); S. Rep. No. 98-225 at 116.  Perhaps the clearest articulation of Congress' general directive to the Commission is that,

> as a starting point in its development of the initial sets of guidelines for particular categories of cases, the Commission [must] ascertain the average sentences imposed in such categories of cases prior to the creation of the Commission, and in cases involving sentences to terms of imprisonment, the length of such terms actually served.[8] The Commission shall not be bound by such average sentences, and shall independently develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of title 18, United States Code.

28 U.S.C. § 994(m).  This subsection outlines the process that the Sentencing Commission used, in general, in constructing the Guidelines and defining the base offense level of various crimes.

This general directive is not, however, the only mandate that Congress gave the Sentencing Commission in § 994.  Subsection (h) provides separate, and far more specific, guidance:

> The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and --
>
> (1) has been convicted of a felony that is --
>
> (A) a crime of violence; or

---

[8] The reference to "the length of such terms actually served" refers to the then-existing institution of federal parole.  Another major feature of the Sentencing Reform Act was its abolition of federal parole.  See Pub. L. No. 98-473, 98 Stat. 1976.

> > > (B) an offense described in section 401 of the Controlled
> > > Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009
> > > of the Controlled Substances Import and Export Act (21 U.S.C.
> > > 952(a), 955, and 959), and chapter 705 of title 46; and

> > (2) has previously been convicted of two or more prior felonies, each of
> > which is --

> > > (A) a crime of violence; or

> > > (B) an offense described in section 401 of the Controlled
> > > Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009
> > > of the Controlled Substances Import and Export Act (21 U.S.C.
> > > 952(a), 955, and 959), and chapter 705 of title 46.

28 U.S.C. § 994(h).  It is pursuant to this directive -- not the general subsection (m) directive to examine past sentencing practices and codify them with alterations only as warranted -- that the Commission crafted the career offender guideline.

The career offender guideline is thus susceptible to attack on two grounds: (i) that the Commission stepped beyond its congressionally granted authority in promulgating the guideline; or (ii) that the guideline, while a valid and permissible exercise of the Commission's authority under § 994(h), need not be applied by judges who disagree with it.

## A.   THE SENTENCING COMMISSION DID NOT EXCEED 28 U.S.C. § 994(h)'S MANDATE WHEN IT PROMULGATED U.S.S.G. § 4B1.1.

The argument for the first ground can best be summarized by the following observation: while Nolf is undoubtedly a career offender under the Guidelines, he falls outside of the definition that Congress provides.  Compare U.S.S.G. § 4B1.1(a) with 28 U.S.C. § 994(h)(2). Nolf's prior aggravated assault conviction is a qualifying conviction under both U.S.S.G. § 4B1.1 and 28 U.S.C. § 994(h)(2)(A).  His prior drug conviction, on the other hand, is a "controlled substance offense" under the Guidelines, but is not one of the federal offenses

enumerated in § 994(h) -- it is an Arizona state law offense.  U.S.S.G. § 4B1.1(a); 4B1.2(b).  See Ariz. Rev. Stat. § 13-3405(A)(2).

There are two potential bases for the Guidelines' alteration of § 994(h)'s definition of career offender.  One is that the Guidelines do not expand the definition: that "an offense described in" various federal statutes is not necessarily the same as a conviction under the statutes themselves.  Under this view, if the facts necessary to support conviction under a state statute would establish all the elements of one of the enumerated federal crimes, then the state-law conviction would satisfy § 994(h)(2)(B).  Nolf's prior drug conviction -- which provides that "[a] person shall not knowingly . . . [p]ossess marijuana for sale," Ariz. Rev. Stat. § 13-3405(A)(2) -- would appear to establish a violation of one of § 994(h)(2)(B)'s enumerated statutes, 21 U.S.C. § 841(a) ("[I]t shall be unlawful for any person knowingly . . . to . . . possess with intent to manufacture, distribute, or dispense, a controlled substance . . . .").

The second potential basis for the Guidelines' alteration of § 994(h)(2)(B)'s definition is that Congress granted the Commission discretion to make reasonable modifications in its implementation of Congress' mandate.  The Court finds this argument most availing.  The Court will not decide here the scope of the Commission's discretion, nor the rigor of scrutiny courts should apply when reviewing the Commission's work.  The Supreme Court has declined to decide whether the Commission is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and the Tenth Circuit appears to have never addressed the issue.  See United States v. LaBonte, 520 U.S. 751, 762 n.6 (1997)("[W]e need not decide whether the Commission is owed deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).").  All that matters here is that there is post-United States v. Booker Tenth Circuit case law: (i) establishing the Commission's

"broad discretion" to expand the § 994(h)'s definition of a career offender, United States v. Chavez, 660 F.3d 1215, 1226-28 (10th Cir. 2011); and (ii) affirming a district court's application of the career offender guideline to an individual on the basis of a state-law drug tracking conviction, see United States v. Espinosa, 449 F.3d 1301 (10th Cir. 2006).

In United States v. Chavez, the Tenth Circuit addressed a defendant's argument that federal convictions for inchoate drug offenses, such as conspiracy and attempt, could not count as qualifying convictions for the purpose of rendering a defendant a career offender.  660 F.3d at 1226-28.  Inchoate drug offenses are outlined in 21 U.S.C. § 846, which, although listed as a qualifying statute of conviction in the career offender guideline, is absent from the list of offenses enumerated in the career offender statute, § 994(h).   As the Honorable Scott M. Matheson, United States Circuit Judge, explained:

> We recognized that conspiracy convictions were not specifically identified in section 994(h) as an offense triggering career offender status.  United States v. Allen, 24 F.3d 1180, 1185.  But we determined that "section 994(h) does not represent an exclusive list of crimes for which enhancement under the career offender guidelines may be imposed" and "does not, by mandating enhancement for certain crimes, preclude the Commission from enhancing others if it is within the Commission's grant of discretion to do so."  24 F.3d at 1186.
>
> We then explained that "Congress gave the Sentencing Commission very broad discretion in drafting the guidelines."  24 F.3d at 1186.  As one example of this broad authority, we quoted 28 U.S.C. § 994(a), which gives the commission authority "to promulgate guidelines . . . which define [an] appropriate . . . term of imprisonment."   24 F.3d at 1186 (quotations omitted).   We concluded that "[a]lthough the current background commentary to section 4B1.1 identifie[d] section 994(h) as the source of the mandate implemented by the guideline, it [was] clear the Commission could rely on the broader language of section 994(a), which in turn refers to all other parts of section 994, to include conspiracy-related offenses in the career offender guideline."  24 F.3d at 1187.
>
> Since our opinion in *Allen*, the Sentencing Commission amended the background commentary to the career offender provision.  As noted above, the prior version of the commentary stated that the career offender provision "implement[ed] the Congressional mandate to the Commission in 28 U.S.C. § 994(h)." Id. at 1185. The current version states:

- 29 -

> Section 994(h) of Title 28, United States Code, mandates that the Commission assure that certain "career" offenders receive a sentence of imprisonment "at or near the maximum term authorized." Section 4B1.1 implements this directive, with the definition of a career offender tracking in large part the criteria set forth in 28 U.S.C. § 994(h).  However, in accord with its general guideline promulgation authority under 28 U.S.C. § 994(a)-(f), and its amendment authority under 28 U.S.C. § 994(o) and (p), the Commission has modified this definition in several respects to focus more precisely on the class of recidivist offenders for whom a lengthy term of imprisonment is appropriate and to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct . . . ." 28 U.S.C. § 991(b)(1)(B).

U.S.S.G. § 4B1.1 cmt. background (emphasis added).

As we recognized in *Allen*, through section 994(a) Congress has given the Sentencing Commission broad discretion in drafting the Guidelines.  See 24 F.3d at 1186.  That the Commission relied on this broad grant of authority in defining the term "controlled substance offense" -- and that it did not rely solely on its promulgation authority under 28 U.S.C. § 994(h) -- is clear from the amendments to the background commentary.  See U.S.S.G. § 4B1.1 cmt. background.  Indeed, the current version of the commentary expressly states that the Sentencing Commission has modified the definition of "controlled substance offense" "in accord with its general guideline promulgation authority under 28 U.S.C. § 994(a)-(f)."  U.S.S.G. § 4B1.1 cmt. background.

Section 994(a)(1)(B) directs the Sentencing Commission to promulgate "guidelines [which define] the appropriate . . . term of imprisonment."   In establishing categories of offenses and their appropriate terms of imprisonment, the Commission is authorized to consider, among other factors, "the nature and degree of the harm caused by the offense," "the community view of the gravity of the offense," and "the deterrent effect a particular sentence may have on the commission of the offense by others."  28 U.S.C. § 994(c)(3)-(6).

We conclude that the Commission acted within this broad grant of authority in construing attempts to commit drug crimes as controlled substance offenses for purposes of determining career offender status.   Because the commentary interprets controlled substance offenses as including convictions for attempted drug trafficking, and because the commentary is authoritative, the district court properly determined that Mr. Chavez should be classified as a career offender.

United States v. Chavez, 660 F.3d at 1227-28 (alterations in original)(footnote omitted).  Thus, the Commission tempers the specific mandate of § 994(h) with its general power under § 994(a)-(f) to fashion consistent and fair sentencing guidelines.  The Commission appears to be doing the same thing here: the Court can think of no good reason why offenders with prior federal drug felonies should be treated differently from offenders who committed all the same actions -- and were proven guilty of the same elements beyond a reasonable doubt -- but were tried in state court.[9]

The Tenth Circuit has never analyzed whether the Commission's "broad discretion" covers its expansion of the career offender status to cover prior state drug convictions as well as prior federal drug convictions, but it has upheld such a result without analysis.  In United States v. Espinosa, a unanimous panel upheld the application of the career offender enhancement to a defendant whose second prior conviction was in New Mexico state court.  See 449 F.3d at 1302-03.  The issue in that case was whether the defendant's prior state-law conviction had "become final" by the time he committed the federal offense, and thus whether it could be counted against him for purposes of triggering the career offender provision.  449 F.3d at 1304.  The district court ruled -- and the Tenth Circuit agreed -- that the state-law conviction had become final, and applied the career offender enhancement.  See 449 F.3d at 1306.  The Tenth Circuit did not analyze whether state-law convictions could even validly support a career offender enhancement in the first instance, but, given the closeness of that issue presented in that case, the Court

---

[9] Further, the Guidelines' equation of state drug felony convictions with federal drug felony convictions in computing criminal history and career offender status tracks the approach Congress took in setting the statutory minimums and maximums for drug felonies.  See 21 U.S.C. § 841(b)(1)(A)(viii), (B)(viii) ("If any person commits such a violation after a prior conviction for a felony drug offense has become final, [then he or she will be subject to an increased statutory maximum and  an increased statutory minimum] . . . .").

believes that, if the Tenth Circuit had believed the Guidelines overstepped their bounds by including state convictions, it would have taken the opportunity to say so.  Furthermore, several other United States Courts of Appeals have ruled directly on this question, finding that the Commission's expansion of § 994(h)(2)(B)'s definition is permissible; no Court of Appeals has ruled to the contrary.  See United States v. Consuegra, 22 F.3d 788 passim (8th Cir. 1994); United States v. Rivera, 996 F.2d 993, 994-97 (9th Cir. 1992); United States v. Whyte, 892 F.2d 1170, 1174 (3d Cir. 1989).[10]

### B. ALTHOUGH COURTS MAY VARY FROM THE GUIDELINES SOLELY ON POLICY CONSIDERATIONS, INCLUDING DISAGREEMENTS WITH THE GUIDELINES, THE COURT WILL NOT DO SO HERE, AS THE GUIDELINES REFLECT CONGRESS' UNAMBIGUOUS INTENT.

The Court will apply the career offender guideline, because failing to do so would defy not only the Sentencing Commission's intent -- which is permissible now that the Guidelines are advisory -- but also that of Congress.  Although "the Guidelines are now advisory and . . . , as a general matter, courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," Kimbrough v. United States, 552 U.S. 85, 101 (2007)(last alteration in original)(internal quotation marks omitted), Congress' institutional primacy in the sentence-setting process remains unquestioned, even after United States v. Booker, see United States v. A.B., 529 F.3d 1275, 1281 (10th Cir. 2008)(Holmes, J.)("[N]othing in the reasoning of *Booker* expands the authority of a district court to sentence below a statutory minimum."  (quoting United States v. Williams, 474 F.3d 1130,

---

[10] These decisions all predate United States v. Booker, which could theoretically change the analysis.  This issue presents itself so frequently, however -- the federal courts hear such a small portion of the nation's drug cases that it is likely that a strong majority of classified career offenders earned that classification on the basis of at least one state-law conviction -- that the Court has a hard time believing that § 4B1.1(a)(3) is illegal, but that no court has yet addressed it.

1132 (8th Cir. 2007))(internal quotation marks omitted)).  In short, Congress is entitled to set the substantive penalties associated with every federal crime.  While United States v. Booker bears on procedure -- Congress may not set up different maximum penalties to be triggered by anything other than a finding, by a jury, of proof beyond a reasonable doubt[11] -- it does not affect Congress' exclusive dominion over the substance of criminal sentences.

Nolf argues that Congress made its career offender provision "a directive to the Commission, rather than a sentencing mandate to the courts."  First Nolf Brief at 4.  That observation may be true, but Congress crafted § 994(h) in the same Act that authorized the creation of mandatory Guidelines and made them binding upon the courts.[12]  See 18 U.S.C. § 3553(b)(1).  In short, Congress explicitly provided that district courts must -- not "may" -- sentence career offenders to a term of imprisonment "at or near the maximum term authorized."  28 U.S.C. § 994(h).  The fact that Congress delivered this mandate indirectly, to the Commission, rather than directly to the district courts, in no way undermines its binding effect on the courts.  To ignore Congress' directive based on the technicality Nolf puts forth would be to nakedly substitute the Court's judgment for Congress' in an area -- constructing the elements

---

[11] The fact of a prior criminal conviction is the sole exception to this rule: a defendant may be exposed to harsher maximum penalties on the basis of prior convictions, and those convictions may be found by a judge to a preponderance of the evidence.  See Apprendi v. New Jersey, 530 U.S. 466, 489-90 (2000); Almendarez-Torres v. United States, 523 U.S. 224 (1998).  As a result, the judicial findings necessary to trigger the career offender provision do not violate Apprendi v. New Jersey or United States v. Booker.

[12] There is nothing inherently unconstitutional about mandatory sentencing guidelines.  Congress could still today set up a mandatory Guidelines regime; it is simply the case that any sentence-enhancement factors -- e.g., that the defendant was armed during the commission of the offense, that he was an organizer or manager, or that he abused a position of trust -- would have to be proven to a jury beyond a reasonable doubt.  Justices Stevens and Scalia preferred this remedy, but the majority of the Supreme Court elected to remedy the constitutional defect by continuing to allow a judge to find enhancements under a preponderance standard and by excising 18 U.S.C. § 3553(b)'s mandatory provision.  See United States v. Booker, 543 U.S. at 303-08.

of statutory crimes -- of congressional competence and constitutional power.  The Court declines

this invitation.

Furthermore, even if the Court were to elect to counteract some or all of the effects of the

career offender provision, it must do so at the variance stage of the sentencing process, not by

simply refusing to apply the provision in the first instance.  This distinction has an enormous

impact on the end result when, as here, a downward departure for providing substantial

assistance to the government will lower the sentence close enough to the statutory mandatory

minimum to prevent further variances from having their full effect.  The Court will explore this

concept in detail when addressing Nolf's argument attacking the three-step sequence.

II.     **THE COURT WILL FOLLOW THE THREE-STEP SEQUENCE FOR APPLYING, AND VARYING FROM, THE GUIDELINES, AND WILL THEREFORE APPLY NOLF'S § 5K1.1 DEPARTURE BEFORE VARYING DOWNWARDS; AS THE COURT CANNOT VARY BELOW THE STATUTORY MANDATORY MINIMUM, THE COURT MAY VARY THE SENTENCE ONLY <u>DOWN TO 60 MONTHS, THE STATUTORY MINIMUM</u>.**

The Court must adhere to the following three-step sequence when sentencing a criminal

defendant: first, determining the appropriate sentencing range on the basis of Guidelines'

chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and

5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors

taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly

provide for it, and courts must still consult the Guidelines, even if they will subsequently vary

from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to

give effect to 18 U.S.C. § 3553(e).[13]   The Court will, thus, assign Nolf a criminal history

_____

[13] Technically, the Court may not need to follow the three-step sequence if the result of the calculation, including all variances, is a sentence above the statutory mandatory minimum. In such circumstances, the resulting sentence will be the same regardless of in what sequence the steps are taken.  As the answer to this question is inconsequential, the Court will restrict its

category of VI and an offense level of 34 pursuant to the career offender provision, adjust

downwards 3 levels for acceptance of responsibility, and then depart downwards 12 levels for his

provision of substantial assistance to the government.  This calculation results in Nolf having a

criminal history category of VI and a final offense level of 19, which equates to a sentence range

of 63-78 months under the Guidelines' sentencing table.  As the statutory mandatory minimum is

60 months (5 years), this result leaves the Court room for a maximum of 3 months of downward

variance.

###### A.    THE GUIDELINES DEMAND THE THREE-STEP SEQUENCE.

Perhaps the most obvious place to look for guidance in determining how to apply the

Guidelines is the Guidelines themselves:

Application Instructions

(a)    The court shall determine the kinds of sentence and the guideline range as
set forth in the guidelines (see 18 U.S.C. 3553(a)(4)) by applying the
provisions of this manual in the following order, except as specifically
directed:

(1)    Determine, pursuant to § 1B1.2 (Applicable Guidelines), the
offense guideline section from Chapter Two (Offense Conduct)
applicable to the offense of conviction.  See § 1B1.2.

(2)    Determine the base offense level and apply any appropriate
specific offense characteristics, cross references, and special
instructions contained in the particular guideline in Chapter Two in
the order listed.

(3)    Apply the adjustments as appropriate related to victim, role, and
obstruction of justice from Parts A, B, and C of Chapter Three.

(4)    If there are multiple counts of conviction, repeat steps (1) through
(3) for each count.  Apply Part D of Chapter Three to group the
various counts and adjust the offense level accordingly.

_____

analysis to those circumstances in which a combination of a § 5K1.1 departure and variances
result in a sentence below the statutory minimum.

(5)     Apply the adjustment as appropriate for the defendant's acceptance of responsibility from Part E of Chapter Three.

(6)     Determine the defendant's criminal history category as specified in Part A of Chapter Four.  Determine from Part B of Chapter Four any other applicable adjustments.

(7)     Determine the guideline range in Part A of Chapter Five that corresponds to the offense level and criminal history category determined above.

(8)     For the particular guideline range, determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution.

(b)     The court shall then consider Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence.  See 18 U.S.C. 3553(a)(5).

(c)     The court shall then consider the applicable factors in 18 U.S.C. [§] 3553(a) taken as a whole.  See 18 U.S.C. 3553(a).

U.S.S.G. § 1B1.1 (emphasis omitted).  The Tenth Circuit has embraced § 1B1.1 on multiple occasions both pre- and post-United States v. Booker.  See United States v. Jeppeson, 333 F.3d 1180, 1183 (10th Cir. 2003)(Kelly, J.)("Section 1B1.1 of the Guidelines sets forth the order in which the various sections of the Guidelines should be applied."); United States v. Allen, 229 F. App'x 742, *744 (10th Cir. Apr. 24, 2007)(Seymour, J.)(unpublished)[14]("Pursuant to § 1B1.1,

---

[14]   United States v. Allen is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

- 36 -

provisions of the guidelines are to be 'applied in' a specified 'order.'"   (quoting U.S.S.G. § 1B1.1)).

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).   In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.   In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."   Irizarry v. United States, 553 U.S. 708, 710-16 (2008).   A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.[15]   See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that United States v. Allen has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[15]   The appellate courts review district courts' sentences for abuse of discretion; this generally nebulous standard has been refined in the context of sentencing into a two-step test for substantive reasonableness and procedural reasonableness.   See United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1214 (10th Cir. 2008).

§ 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence"  (emphasis added)).

Although the Tenth Circuit has avoided directly passing on the question whether the three-step sequence is mandatory, see United States v. A.B., 529 F.3d 1275, 1287 (10th Cir. 2008)(Holmes, J.), it has acknowledged the importance of honoring the Guidelines' specified sequence in other settings.  In fact, the career offender provision is one such context: first, a defendant's "otherwise applicable" offense level is determined the same way non-career offender's offense level would be -- by starting with the chapter 2 base offense level for the crime of conviction, and then applying any relevant chapter 3 adjustments for, e.g., using a minor to commit a crime, playing a leadership role in a criminal enterprise, using a gun or body armor, etc.; second, the court must compare this "otherwise applicable" offense level with the stock career offender offense level that U.S.S.G. § 4B1.1 supplies, and then proceed with the higher of the two.  If the § 4B1.1 offense level is higher, then the court never applies the chapter 3 adjustments,[16] even if they would benefit the defendant.  As the Honorable Paul J. Kelly, United States Circuit Judge, wrote for a unanimous panel:

> Although . . . § 4B1.1 does not expressly preclude a role in offense adjustment, a close look at the sequence in which a sentencing court is instructed to apply § 4B1.1 reveals that courts should not make such a reduction subsequent to making a career offender adjustment.  Section 1B1.1 of the Guidelines sets forth the order in which the various sections of the Guidelines should be applied.

United States v. Jeppeson, 333 F.3d at 1183 (citing United States v. Alessandroni, 982 F.2d 419, 421 (10th Cir. 1992)).  Although United States v. Jeppeson came out before United States v.

---

[16]  Chapter 3 of the Guidelines includes, among others, adjustments upwards and downwards for the defendant playing a leadership, minor, or minimal role in a criminal enterprise, see U.S.S.G. § 3B, enhancements for hate crimes and crimes against vulnerable victims, see U.S.S.G. § 3A1.1, crimes against an "official victim," U.S.S.G. § 3A1.2, and obstruction of justice, see U.S.S.G. § 3C1.1.  These adjustments are not applied to career offenders regardless whether they would increase or decrease the sentence.

<u>Booker</u>, the Tenth Circuit has favorably cited it since.  <u>See</u>, <u>e.g.</u>, <u>United States v. Allen</u>, 229 F. App'x at *744 ("Pursuant to § 1B1.1, provisions of the guidelines are to be 'applied in' a specified 'order.'"  (quoting U.S.S.G. § 1B1.1)).

   **B.    THE THREE-STEP PROCESS IS NECESSARY TO GIVE EFFECT TO CONGRESS' EXPRESS LIMITATION ON DISTRICT COURTS' AUTHORITY TO IMPOSE SENTENCES BELOW THE STATUTORY MINIMUM.**

   One of the underlying reasons for the Guidelines' three-step sequence is that the sentencing mandate of 18 U.S.C. § 3553(e) would be rendered meaningless if district courts were free to apply variances at whatever stage they pleased.  That subsection provides as follows:

> **Limited authority to impose a sentence below a statutory minimum.** -- Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

18 U.S.C. § 3553(e) (emphasis in original).  The only other way in which a court may impose a sentence beneath the statutory minimum is the safety valve provision, which is inapplicable to Nolf because of his criminal history.  <u>See</u> 18 U.S.C. § 3553(f)(1) (providing that the safety valve is available only if "the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines").

   Nolf's situation illustrates the difference that the sequence of applying deviations makes on the final sentence.  The Court will assume, for the purpose of this analysis, that Nolf is entitled to a variance the equivalent of seven levels.  <u>See</u> First Nolf Brief at 25 (requesting a sentence of "not more than 36 months," which with Nolf's criminal history corresponds to an offense level of 12, rather than 19).  Under the three-step sequence, Nolf starts with a career offender offense level of 34; gets a 3-point reduction for acceptance of responsibility; and then

receives a 12-point reduction for providing substantial assistance to the government.  At that point, with an offense level of 19 and a criminal history category of VI, the bottom of Nolf's sentencing range, 63-78 months, is only 3 months above the statutory minimum.  As such, even if the Court wanted to grant Nolf a downward variance equivalent to 7 levels, it could vary only the equivalent less than one level before it hit the statutory mandatory minimum, and the equivalent of 6 levels of meritorious variance justifications would go to unused.  If, however, the second and third steps of the three-step sequence were switched, and variances were applied before the § 5K1.1 departure: Nolf would start with a career offender level of 34; the variance equivalent to 7 levels would take him down to 27; and the 12-level downward departure for substantial assistance would bring Nolf's offense level to 15, corresponding to a range of 41-51 months.  Under the modified sequence, the straw that broke the camel's back -- i.e., the reduction that took Nolf's sentence below the statutory minimum -- was the departure for substantial assistance, which is permissible under § 3553(e).

Although this result may seem to some normatively desirable -- i.e., it gives district judges more power -- it converts § 3553(e)'s "limited [grant of] authority" from a loophole to a barn door.  To determine whether the Court has the authority to deviate from the three-step sequence, it need ask only two questions: (i) what was the legal effect of § 3553(e) when Congress passed it? -- the answer to this question is unmistakably clear; and (ii) what, if anything, has changed the subsection's meaning in the ensuing years?  The Court concludes that United States v. Booker did not alter the meaning of § 3553(e), and, thus, the subsection means the same thing it did when Congress first enacted it in 1984: that a statutory mandatory minimum binds the courts, regardless whether the Guidelines suggest a lower sentence, with the sole

exception that a § 5K1.1 departure applied to the tail end of a by-the-book Guidelines calculation may result in a sentence below that minimum.

### 1.    Congress Passes the Sentencing Reform Act.

Congress passed the Sentencing Reform Act as part of the Comprehensive Crime Control Act of 1984.  See Pub. L. No. 98-473, 98 Stat. 1976.  The Act created § 3553 in its entirety, established the Sentencing Commission, and authorized the creation of mandatory sentencing guidelines.  See 18 U.S.C. § 3553; 28 U.S.C. § 991-998.  Congress passed the Act because it was concerned that the previously unfettered discretion given to judges to impose sentences ranging anywhere from the mandatory minimum -- and many statutes did not provide a minimum, so imprisonment could be foregone entirely in favor of probation -- up to the statutory maximum was resulting in inconsistent treatment of similar offenders by different judges.  Congress wanted increased consistency, but also desired sentencing that adequately took into account the differences among different offenders convicted under the same statute, such as whether the offender had been a major or minor player in a criminal enterprise, whether the offender had shown a willingness to use violence, and whether the offender had abused the public trust. Accordingly, it rejected "charge offense sentencing," which provides determinate statutory sentences for different offenses, in favor of a "real offense sentencing" regime in which the aforementioned factors would be relevant to determining an offender's sentence within a broad statutory range.  U.S.S.G. § 1A1.4.  Left to their own devices, judges were already considering these factors as aggravating and mitigating circumstances in their sentence determinations, and thus had the requisite experience and expertise to make the findings Congress wanted.  See U.S.S.G. § 1A1.3.  All Congress wanted was increased consistency and increased control over "outlier" judges.  See U.S.S.G. § 1A1.3.  Basically, Congress wanted to codify the sentencing

practices of judges, generally, while negating the proclivities, idiosyncrasies, and prejudices of individual judges.[17]   To accomplish this goal, Congress knew it would need to gather and analyze detailed empirical evidence on existing sentencing practices from across the ninety-four judicial districts; it would also need to check its work with extensive ongoing feedback from judges, prosecutors, and public defenders; and it also envisioned using these analytical methods to identify areas in which existing sentencing practices were too lenient or too harsh, and effectuate changes in the right direction.   Desiring such a system, but lacking the institutional capacity to conduct the research and craft the detailed sentencing provisions it desired, Congress did the same thing it had done -- with great success and with the Supreme Court's blessing -- in the areas of environmental regulation, communications licensing, and election-finance monitoring: it delegated authority.

Despite the Sentencing Commission's technical "location" within the Judicial Branch, it was and is an independent agency, and in crafting the Guidelines, it exercises the legislative power of the United States, loaned from Congress.   See Mistretta v. United States, 488 U.S. 361 (1989)(upholding the constitutionality of the Commission and the Guidelines against challenges on the grounds of nondelegation and separation of powers).   The Guidelines were as mandatory as if Congress had passed them itself -- the same as regulations that any other independent agency promulgates.   See, e.g., Stinson v. United States, 508 U.S. 36, 42 (1993).   Although

_____

[17] Congress had, in previous years, entrusted the Parole Commission with the pursuit of this goal.   In 1976, Congress passed the Parole Commission and Reorganization Act, 18 U.S.C. §§ 4201-4218, which granted parole officers wide latitude to determine prisoners' release dates, at least in part, "to moderate the disparities in the sentencing practices of individual judges." United States v. Addonizio, 442 U.S. 178, 189 (1979).   Congress did a 180-degree turn on this solution in the Sentencing Reform Act, abolishing the federal parole system entirely.   See Pub. L. 98-473, 98 Stat. 1976.

courts could have invalidated any one of the guidelines on the ground that it exceeded the Commission's congressional grant of authority, no guideline was ever struck down as such.

Statutory mandatory minimum sentences had existed before the Act, and the new Guidelines did not affect them, i.e., if a defendant's Guidelines-calculated sentence turned out to be lower than the statutory minimum, the statutory minimum would apply.  This interpretation respects the primacy of Congress in making the law.  It also was and is consistent with the administrative law principle that, even when Congress delegates authority to an outside entity to flesh out the finer details of a legislative regime, the entity may not change or reinterpret Congress' unambiguous mandates.

Congress crafted two exceptions permitting courts to impose sentences below the statutory minimum: the substantial assistance provision of 18 U.S.C. § 3553(e); and the safety valve provision of 18 U.S.C. § 3553(f).  The two exceptions exist for fundamentally different purposes: subsection (e) was designed to arm prosecutors with the ability to offer sweetened plea bargains, unimpeded by statutory minimums, to offenders capable of providing important assistance in taking down criminal enterprises; subsection (f) was formed out of more traditional concerns of the criminal justice system -- fairness and the opportunity for rehabilitation -- recognizing that the statutory minimums were sometimes unfairly harsh when applied to certain first-time, non-violent offenders.  See United States v. Altamirano-Quintero, 511 F.3d 1087, 1090 n.6 (10th Cir. 2007).  Congress' creation of these provisions, however, did not indicate that it suddenly trusted courts to wield unlimited discretion whenever a first-time non-violent offender or a government informant was involved: the Guidelines were still mandatory, even if the statutory minimums no longer were.  To read these two subsections any other way would be to read the Sentencing Reform Act as giving more sentencing discretion to

judges -- as before the Act, statutory minimums were binding -- the exact opposite of Congress'
true intention.

That the Guidelines continued to be mandatory even when § 3553(e) or (f) applied would
have been clear as a purposive matter even if the statute had remained silent on the matter, but it
does not.  Subsections (e) and (f) have little else in common, but they both specifically provide
that the sentencing court's authority to impose a below-minimum sentence is limited by, and
conditional upon, strict adherence to the Guidelines.  Compare § 3553(e) ("Such sentence shall
be imposed in accordance with the guidelines and policy statements issued by the Sentencing
Commission pursuant to section 994 of title 28, United States Code."), with § 3553(f) ("[T]he
court shall impose a sentence pursuant to guidelines promulgated by the United States
Sentencing Commission under section 994 of title 28 . . . .").  Strict adherence to the Guidelines,
of course, includes adherence to the Guidelines' explicitly laid-out sequence of applying its
provisions.  See U.S.S.G. § 1B1.1.

### 2.      The Supreme Court Issues United States v. Booker.

It is tempting to make the following four-step logical inference: (i) in 1984, Congress
made the Guidelines mandatory in general; (ii) also in 1984, Congress made the Guidelines
mandatory in the context of a § 3553(e) or (f) departure beneath the statutory minimum; (iii) in
2005, the Supreme Court made the Guidelines ranges advisory, in general; and, therefore,
(iv) also in 2005, the Supreme Court made the Guidelines ranges advisory in the context of a
§ 3553(e) or (f) departure beneath the statutory minimum.  This analysis misapprehends the
Supreme Court's holding in United States v. Booker, particularly that its decision to sever
§ 3553(b) and to render the Guidelines ranges advisory was a matter of statutory interpretation,
not a necessary remedial consequence of its constitutional holding.

The Supreme Court's decision in United States v. Booker was the culmination of a line of cases that began with Apprendi v. New Jersey, 530 U.S. 466 (2000).  In Apprendi v. New Jersey, the Supreme Court invalidated a judge's application of a hate-crime enhancement that raised a defendant's exposure at sentencing from ten years, the statutory maximum provided for the crime of prohibited possession of a weapon, to twenty years.  The Supreme Court held -- not that there was any problem with the hate-crime enhancement raising the maximum sentence or even that the enhancement was mandatory rather than at the judge's discretion -- but that the procedure by which the enhancement was applied violated the Sixth Amendment to the Constitution of the United States.   After the defendant was convicted of the prohibited possession of a weapon charge, the judge found -- without a jury and by a preponderance of the evidence -- that the defendant had acted "with a purpose to intimidate . . . because of race, color, gender, handicap, religion, sexual orientation or ethnicity."  530 U.S. at 468-69.  Pursuant to New Jersey law, the judge applied the hate-crime enhancement and sentenced the defendant to a twelve-year term of imprisonment.  The Supreme Court held that, if a factual finding, other than of a prior conviction, will subject a defendant to a higher maximum sentence than he would otherwise face without the factual finding, then that factual finding must be made by a jury to a standard of proof beyond a reasonable doubt.  To allow otherwise, the Supreme Court said, would be to gut the Sixth Amendment right to trial by jury and proof of guilt beyond a reasonable doubt.  Justice Scalia wrote in a case foreshadowing Apprendi v. New Jersey:

> Suppose that a State repealed all of the violent crimes in its criminal code and replaced them with only one offense, "knowingly causing injury to another," bearing a penalty of 30 days in prison, but subject to a series of "sentencing enhancements" authorizing additional punishment up to life imprisonment or death on the basis of various levels of mens rea, severity of injury, and other surrounding circumstances.  Could the State then grant the defendant a jury trial, with requirement of proof beyond a reasonable doubt, solely on the question whether he "knowingly cause[d] injury to another," but leave it for the judge to

determine by a preponderance of the evidence whether the defendant acted intentionally or accidentally, whether he used a deadly weapon, and whether the victim ultimately died from the injury the defendant inflicted?  If the protections extended to criminal defendants by the Bill of Rights can be so easily circumvented, most of them would be, to borrow a phrase from Justice Field, "vain and idle enactment[s], which accomplished nothing, and most unnecessarily excited Congress and the people on [their] passage."  Slaughter-House Cases, 83 U.S. 36, 16 Wall. 36, 96 (1872).

Monge v. California, 524 U.S. 721, 738-39 (1998)(Scalia, J., dissenting).

Two years later, in Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court invalidated a defendant's death sentence where that sentence had been imposed through a two-step process: (i) the defendant was found guilty at his jury trial of first-degree murder, a charge that authorized the death penalty but only if additional findings were made at a separate hearing; and (ii) at that separate hearing, the trial judge analyzed a list of 10 statutory aggravating factors, found that at least one of them applied, and consequently sentenced the defendant to death.  The Supreme Court ruled that, "because the judge . . . imposed a sentence greater than the maximum he could have imposed under state law without the [additional] factual finding," the defendant's Sixth Amendment rights had been violated.  Blakely v. Washington, 542 U.S. 296, 303 (2004)(summarizing Ring v. Arizona).

Two years after Ring v. Arizona, the Supreme Court sounded the death knell for the United States Sentencing Guidelines, at least in their contemporary form, in Blakely v. Washington.  See 542 U.S. at 301-13.  That case invalidated a sentence imposed under the State of Washington's sentencing guidelines.  The defendant there had pled guilty to second-degree kidnapping, a B-felony punishable by a term of imprisonment of up to ten years.  Washington's mandatory sentencing guidelines provided, however, that the "standard" sentencing range -- analogous to the federal Guidelines' "base offense level" -- for second-degree kidnappers with the defendant's criminal history was 49-53 months.  Thus, even though the

- 46 -

statute provided for a sentence over twice the guidelines range, the most prison time the defendant could receive, absent additional findings, was less than five years.  At sentencing, the judge found that the defendant had acted with "deliberate cruelty," the basis of an enhancement under the guidelines, and sentenced him to ninety months -- thirty-seven months above the standard guidelines range, but still thirty months short of the statutory maximum.  The Supreme Court held that, because the defendant's exposure had increased on the basis of facts not proven to a jury,[18] the defendant's Sixth Amendment rights had been violated.

After Blakely v. Washington, the unconstitutionality of the mandatory United States Sentencing Guidelines was obvious.  See Blakely v. Washington, 542 U.S. at 314-326 (O'Connor, J., dissenting)("What I have feared most has now come to pass: Over 20 years of sentencing reform are all but lost, and tens of thousands of criminal judgments are in jeopardy." (citation omitted)).  What was not clear was how the Supreme Court would remedy the constitutional defect.  When the Supreme Court finally considered the question in United States v. Booker, it considered two options: (i) keep the Guidelines mandatory, but transfer the fact-finding of enhancement factors to the jury, to be proven beyond a reasonable doubt; or (ii) keep the fact-finding of enhancement factors with the judge, to be proven to a preponderance, but make their application discretionary -- i.e., a judge could find that an enhancement applied, but still refuse to apply it.  The Supreme Court opted for the second choice.

So separate were the two issues -- whether the mandatory Guidelines regime was unconstitutional, and, if so, what to do about it -- that the Supreme Court addressed them in two

---

[18] Just as a guilty plea can establish a conviction beyond a reasonable doubt because it contains a specific waiver of the defendant's rights to a jury trial, a guilty plea can also function as a waiver of the defendant's Apprendi v. New Jersey rights.  This waiver would require, however, that the defendant specifically "plead to" the relevant enhancements.  See Blakely v. Washington, 542 U.S. at 310.

separate opinions written by two different Justices, each of whom vehemently disagreed with the other Opinion of the Court in the case.  The Honorable John Paul Stevens, Associate Justice of the Supreme Court of the United States, wrote the constitutional opinion invalidating the mandatory Guidelines regime.  That opinion was written over a strong dissent by the Honorable Steven G. Breyer, Associate Justice of the Supreme Court of the United States.  An opponent of the Supreme Court's emerging Sixth Amendment jurisprudence since its beginnings in Apprendi v. New Jersey, Justice Breyer defended the constitutionality of the mandatory Guidelines.  Justice Breyer, however, wrote the remedial holding, this time over the dissent of Justice Stevens, who believed that the Guidelines should continue to be mandatory and that the jury should find all enhancement factors.  Justice Breyer rejected this remedy, stating that "Congress would have preferred the total invalidation of the statute to the dissenters' remedial approach." 543 U.S. at 258.  Justice Breyer wrote for the Supreme Court that, after

> examin[ing] the statute in depth to determine Congress' likely intent *in light of today's holding* [written by Justice Stevens,] we have concluded that . . . it is more consistent with Congress' likely intent in enacting the Sentencing Reform Act (1) to preserve important elements of that system while severing and excising two provisions (§§ 3553(b)(1) and 3742(e))[19] than (2) to maintain all provisions of the Act and engraft today's constitutional requirement onto that statutory scheme.

United States v. Booker, 543 U.S. at 265 (emphasis in original).  Thus, as a matter of statutory interpretation -- or what Justice Stevens called an "innovative approach to severability

---

[19]  Section 3742(e) concerned appellate review of sentencing, requiring the courts of appeals to set aside sentences not imposed pursuant to proper application of the Guidelines.

The courts, including the Tenth Circuit, have generally concluded that all of § 3553(b) is unconstitutional, as the other part of the subsection, (b)(2), also purports to require district court adherence to the Guidelines.   See United States v. Grigg, 442 F.3d 560 (7th Cir. 2006)(Ripple, J.); United States v. Selioutsky, 409 F.3d 114, 117 (2d Cir. 2005); United States v. Yazzie, 407 F.3d 1139, 1145-46 (10th Cir. 2005).

analysis" -- the Supreme Court excised subsection (b) from § 3553 and fashioned the advisory system in place today.  543 U.S. at 291 (Stevens, J., dissenting).

The Supreme Court recognized that its remedy went beyond what the Constitution demands: because only sentence enhancements trigger the Sixth Amendment, the Supreme Court could have left mandatory sentence reductions and "base level" sentencing guidelines intact, and rendered only the enhancements advisory.[20]  The Supreme Court elected not to do so, again on

---

[20] It is not entirely clear why reductions -- when mandatory and based on judicial fact-finding -- do not violate the Sixth Amendment.  After all, if a defendant were convicted of an offense carrying a sentence of 10 years, but there was a 3-year reduction that a the judge must apply if and only if certain facts were proven to him to a preponderance of the evidence, that defendant would be placed in much the same position as the defendant in Apprendi v. New Jersey: his maximum exposure rises from 7 years to 10 years on the basis of a factual finding not submitted to a jury or proven beyond a reasonable doubt.  The hypothetical that Justice Scalia presented in Monge v. California could be reversed and would loom just as large: enhancements could be recast as reductions -- for committing the crime without a firearm, for not acting as a leader or organizer, for the crime not resulting in serious bodily injury or death, etc. -- and the defendant would once again find his Sixth Amendment jury trial rights all but entirely circumvented.

Dicta in United States v. Booker makes it clear, however, that the Supreme Court does not view sentence reductions as implicating the Sixth Amendment.

> The Government would render the Guidelines advisory in 'any case in which the Constitution prohibits' judicial factfinding.  But it apparently would leave them as binding in all other cases. . . .  [T]he Government's proposal would impose mandatory Guidelines-type limits upon a judge's ability to *reduce* sentences, but it would not impose those limits upon a judge's ability to *increase* sentences.

United States v. Booker, 543 U.S. at 266 (Breyer, J.)(emphasis in original).  See also Dillon v. United States, 560 U.S. 817, 829 (2010).  This mentality -- that enhancements, but not reductions, trigger procedural protections under Apprendi v. New Jersey -- most likely survives the Supreme Court's recent holding in Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013)(Thomas, J.).  That case overruled a prior Supreme Court case, Harris v. United States, 536 U.S. 545 (2002), which had held that the Sixth Amendment permits post-conviction judicial fact-finding that results in an increase to the minimum sentence the defendant faces, essentially limiting Apprendi v. New Jersey's holding to mandatory maximums, and not mandatory minimums.  The Honorable Clarence Thomas, Associate Justice of the Supreme Court of the United States, wrote that the Sixth Amendment rule articulated in Apprendi v. New Jersey applies to mandatory minimums, as well:

the basis of congressional intent and not constitutional restriction.  Justice Breyer wrote that such

an approach

> would impose mandatory Guidelines-type limits upon a judge's ability to *reduce*
> sentences, but it would not impose those limits upon a judge's ability to *increase*
> sentences.  We do not believe that such "one-way lever[s]" are compatible with
> Congress' intent.   For another, we believe that Congress would not have
> authorized a mandatory system in some cases and a nonmandatory system in

> _____

> *Harris* drew a distinction between facts that increase the statutory
> maximum and facts that increase only the mandatory minimum.  We conclude
> that this distinction is inconsistent with our decision in *Apprendi v. New Jersey*,
> and with the original meaning of the Sixth Amendment.  Any fact that, by law,
> increases the penalty for a crime is an "element" that must be submitted to the
> jury and found beyond a reasonable doubt.   Mandatory minimum sentences
> increase the penalty for a crime.  It follows, then, that any fact that increases the
> mandatory minimum is an "element" that must be submitted to the jury.
> Accordingly, *Harris* is overruled.

Alleyne v. United States, 133 S. Ct. at 2155 (citations omitted).

      Now any factual finding that raises either the ceiling or the floor of a defendant's
sentencing exposure must be proven to a jury beyond a reasonable doubt.  Sentence reductions,
however, do not raise a defendant's minimum exposure; they lower it, and so there may be
principled ground to continue to honor Justice Breyer's above-quoted dicta even in the face of
Alleyne v. United States.   Justice Breyer, however, after years of assiduous opposition to
Apprendi v. New Jersey, defense of the mandatory Guidelines, and voting with the majority in
Harris v. United States, joined the majority in Alleyne v. United States, stating:

> Eleven years ago, in *Harris v. United States*, I wrote that "I cannot easily
> distinguish *Apprendi v. New Jersey*, from this case in terms of logic."   I
> nonetheless accepted *Harris*' holding because I could "[n]ot yet accept
> [*Apprendi*'s] rule."  I continue to disagree with *Apprendi*.  But *Apprendi* has now
> defined the relevant legal regime for an additional decade.  And, in my view, the
> law should no longer tolerate the anomaly that the *Apprendi*/*Harris* distinction
> creates.

133 S. Ct. at 2166 (Breyer, J., concurring)(alterations in original)(citations omitted).   The
principle backers of the Apprendi v. New Jersey doctrine were Justice Stevens, who has retired,
and Justice Scalia, who dissented in Alleyne v. United States, see 133 S. Ct. at 2167, and the
doctrine's most stalwart opponent, Justice Breyer, now writes that he has come to accept it.  The
Supreme Court's position on the issue is, thus, somewhat speculative, but until a higher court
resolves the issue, the Court will continue to conclude that sentence reductions are not subject to
the same procedural protections that attach to sentence enhancements under Apprendi v. New
Jersey.

others, given the administrative complexities that such a system would create.
Such a two-system proposal seems unlikely to further Congress' basic objectives
of promoting uniformity in sentencing.

543 U.S. at 266-67 (emphasis in original).   The Supreme Court made clear that mandatory

reductions based on judicial fact-finding would be permissible under the Sixth Amendment and

that Congress could enact such a scheme if it wished.  See infra n.19.

### 3.   United States v. Booker's Holding Leaves 18 U.S.C. § 3553(e) Unaffected.

United States v. Booker's remedial holding was limited, and did not affect the continued

viability of subsection (e) of § 3553.  There is also nothing in the Supreme Court's constitutional

holding that would alter subsection (e)'s meaning, and, thus, it must be read to mean the same

thing today as it did when it was passed.  Although courts are generally bound by statutory

minimums, Congress has granted them limited authority to disregard those minimums when

three conditions are met: (i) the Guidelines indicate a sentence below the statutory minimum;

(ii) that calculation is reached pursuant to a downward departure for providing substantial

assistance to the government; and (iii) the sentence imposed is the one indicated by the

Guidelines.   See 18 U.S.C. § 3553(e).   Adherence to the three-step sequence is thus a

prerequisite for imposing a sentence below the statutory minimum pursuant to § 3553(e).

Deviation from the three-step sequence -- far from being a corollary of United States v. Booker's

holding that the Guidelines are advisory -- effectively renders the United States Code advisory,[21]

at least to a judge sentencing a defendant who has assisted the government.

---

[21] As an analogy, consider the other provision through which Congress has granted courts
the authority to go below its specified minimums, the safety valve.  See 18 U.S.C. § 3553(f).
That subsection provides that the safety valve may be applied only to defendants with fewer than
two criminal history points, as calculated under the Guidelines.   Section 4A1.3(b) of the
Guidelines, however, allows courts to "horizontally depart" -- to alter a defendant's criminal
history based on the court's belief that a rigid computation over-represents the seriousness of the

United States v. Booker has no impact on the continued viability of statutory maximums or minimums.[22]  See United States v. A.B., 529 F.3d at 1281 ("'[N]othing in the reasoning of *Booker* expands the authority of a district court to sentence below a statutory minimum.'" (quoting United States v. Williams, 474 F.3d 1130, 1132 (8th Cir. 2007))).  When a defendant is convicted of a crime -- whether by jury verdict or guilty plea -- all the elements of the statutory offense are proven beyond a reasonable doubt to a jury, either actually or by waiver.  As long as the statute of conviction carries with it at most one statutory maximum and at most one minimum, versus several potentially applicable maximums or minimums to be chosen on the basis of factual findings not part and parcel of the plea or verdict (which establishes the factual

---

defendant's criminal history -- a maximum of one level.  If the Court were to ignore -- or "vary from," as Nolf likes to call ignoring the Guidelines in the first instance -- the one-level limitation, it could theoretically horizontally vary a defendant with a serious criminal history down to one point, apply the safety valve, and impose a sentence below the statutory minimum.  But see U.S.S.G. § 4A1.3(b)(3)(B) (providing that horizontal departures cannot be used to trigger the safety valve; to implement this interpretation, the Court would have to ignore this guideline, as well).  This interpretation would obviously be unacceptable, and it is analogous to the § 3553(e) interpretation that Nolf suggests, because it involves using a variance to trigger a statutory provision that expressly provides that it may be triggered only by events within the Guidelines.

[22] Until recently, minimum sentences did not implicate the rule from Apprendi v. New Jersey at all.  In Harris v. United States, 536 U.S. 545 (2002), the Supreme Court upheld 18 U.S.C. § 924(c)(1)(A), which provides that, if a sentencing judge finds by a preponderance of the evidence that a defendant convicted of drug trafficking or a crime of violence had: (i) carried a firearm during the commission of the offense, then the minimum sentence the court may impose is five years, regardless whether the statute of conviction provides for a lower minimum; (ii) brandished a firearm, then the minimum sentence that the court may impose is seven years; and (iii) discharged a firearm, then the minimum sentence that the court may impose is ten years.  See 536 U.S. at 550-51.  The Supreme Court held that, although a fact must be proven beyond a reasonable doubt to a jury if it is to raise the maximum sentence that a defendant faces, judicial fact-finding may result in raising the mandatory minimum sentence without running afoul of the Sixth Amendment.  In Alleyne v. United States, 133 S. Ct. 2151, 2163 (2013), the Supreme Court overruled Harris v. United States, and held that a factual finding which will raise a defendant's minimum exposure must be made by a jury and found beyond a reasonable doubt.

- 52 -

finding for all the elements of the statutory offense), the rule from Apprendi v. New Jersey is satisfied.[23]

---

[23] A "crime of conviction" has at most one maximum sentence and at most one minimum sentence. If, hypothetically, a defendant were to plead guilty to a subsection of the United States Code that contains more than one sentencing maxima or minima, the defendant could only be subjected to the most lenient maximum or minimum, unless the factual findings needed to trigger the harsher maximums or minimums are made by a jury or the defendant stipulates to them. Nolf's statute of conviction provides:

§ 841   Prohibited acts

(a)   Unlawful acts
Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally --

(1)   to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2)   to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

(b)   Penalties
Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

(1)   (A)   In the case of a violation of subsection (a) of this section involving --

(i)   1 kilogram or more of a mixture or substance containing a detectable amount of heroin;

(ii)   5 kilograms or more of a mixture or substance containing a detectable amount of --

(I)   coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of egonine or their salts have been removed;

(II)   cocaine, its salts, optical and geometric isomers, and salts of isomers;(III) ecgonine,

its derivatives, their salts, isomers, and salts of isomers; or

(IV)   any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii)   280 grams or more of a mixture or substance described in clause (ii) which contains cocaine base; [or]

. . . .

(viii)   50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers; such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life . . . .

(B)   In the case of a violation of subsection (a) of this section involving --

(i)   100 grams or more of a mixture or substance containing a detectable amount of heroin;

. . . .

(vii)   100 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 100 or more marihuana plants regardless of weight; or

(viii)   5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers; such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life. . . .  If any person commits such a

- 54 -

Thus, the Constitution does not compel a reading of § 3553(e) that permits deviation from the three-step sequence.  The only question remaining is whether, as a matter of statutory interpretation, § 3553(e) permits deviation from the sequence.  The subsection demands that "[s]uch sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission."  18 U.S.C. § 3553(e).  The question is whether the condition,

---

violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment . . . .

21 U.S.C. § 841.  The sentences are specified in (b)(1)(A)(viii) and (b)(1)(B)(viii).

Nolf only needs to plead guilty to § 841(b)(1)(B), not specifically to (b)(1)(B)(vii), because each component of (b)(1)(B) carries the same sentence.  For that matter, Nolf need not plead specifically to § 841(a)(1) or (a)(2), but may plead to § 841(a) generically, as the penalties do not differ between (a)(1) and (a)(2).  On the other hand, if Nolf were to plead guilty to § 841(b), or (b)(1), generically, then he could be subjected only to the lower sentencing scheme of (b)(1)(A), and not to the harsher penalties of (b)(1)(B).

Last, although all the offenses enumerated in § 841(b)(1)(B)(i)-(viii) are punished by a single sentencing scheme, further factual findings must be made to determine the maximum and minimum sentence applicable to any given defendant.  The statutory sentence range applicable to Nolf's crime of conviction is: 5-40 years; 10 years to life if the defendant has been previously convicted of a drug felony; 20 years to life if death or serious bodily injury resulted from the crime; and mandatory life imprisonment if the defendant has been previously convicted of a drug felony and death or serious bodily injury resulted from the crime.  Thus, two additional factual findings determine the defendant's range: (i) whether the defendant has been convicted of a prior drug felony; and (ii) whether the crime of conviction resulted in death or serious bodily injury.  The first determination may be made by a judge by a preponderance of the evidence, because findings of prior convictions are exempted from the Apprendi v. New Jersey rule.  See Almendarez-Torres v. United States, 523 U.S. 224 (1998).  The Court, thus, could sentence Nolf to a sentence of 10 years to life without violating the Constitution.  There is, however, a statutory procedure that must be followed wherein the United States must file an information with the Court to use any prior convictions to trigger increases in statutory sentence ranges.  See infra n.3; 21 U.S.C. § 851(a)(1).  The determination whether death or serious bodily injury resulted from a crime, on the other hand, must either be specifically plead to, or proven to a jury beyond a reasonable doubt, or the defendant cannot be subjected to either the increased minimum (from 5 to 10 years) or the increased maximum (40 years to life) sentence.

- 55 -

"imposed in accordance with the guidelines," be interpreted, in light of United States v. Booker, to include the process of varying from the Guidelines on the basis of the § 3553(a) factors.  The Court thinks not.  For starters, it defies the statute's plain language to interpret "in accordance with" to include "variances from," as the two terms are antonymic.  Compare Black's Law Dictionary 19 (9th ed. 2009)(defining "accordant" as "[i]n agreement"), and The American Heritage Dictionary of the English Language 9 (William Morris ed., New College ed. 1976)(defining "accordance" as "[a]greement; conformity"), with Black's Law Dictionary 1692 (defining "variance" as "[a] difference or disparity between two statements or documents that ought to agree"), and The American Heritage Dictionary of the English Language 1417 (defining "variance" as "[a] difference of opinion; dissention; a dispute," or "[a] discrepancy between two statements or documents in a legal proceeding").  The Court also considers the nature of the statute that § 3553(e) is: it is not merely a substantive statute, but a grant of "limited authority" to the courts.  Were it a list of substantive factors, like § 3553(a), aiming to guide courts in sentencing more fairly and consistently, then it might be suitable to reinterpret some factors, in light of changed circumstances, if other factors had been found constitutionally defective as originally interpreted.  Section 3553(e) is not such a statute.  As a grant of limited authority, it should not be interpreted more broadly than its unambiguous original meaning unless -- and only to the extent that -- the Constitution compels reinterpretation.  As the Court has already exhaustively determined, the Constitution does no such thing.

Opponents of the proper interpretation of § 3553(e) do not, however, rely on arguments about traditional statutory interpretation to advance their cause.  To what they instead point are the allegedly unfair and arbitrary results of § 3553(e)'s proper application.  To illustrate their point, the Court will outline a hypothetical situation:

- 56 -

A defendant is convicted of an offense for which the statutory minimum is 60 months; the Guidelines indicate a base-level sentence of 80 months;[24] the Government moves for a 25-month downward departure for substantial assistance; and the sentencing court also finds that, based on the § 3553(a) factors, the defendant is entitled to a 25-month downward variance. There are then three potential results the court could reach, depending on its interpretation of § 3553(e): (i) impose a sentence of 55 months, first applying the 25-month departure and then, because the result is below the statutory minimum, refusing to apply any variance; (ii) impose a sentence of 35 months, first applying 20 months of the 25-month downward variance -- refusing to apply the last 5 months because doing so would result in a sentence below the statutory minimum -- and then applying the 25-level departure; or (iii) impose a sentence of 30 months, giving the defendant full credit for both the variances and the § 5K1.1 departure -- the sequence makes no difference to the result.

All three interpretations give § 3553(e) some content.  The third interpretation -- which no one in this case advances -- reads subsection (e) as permitting courts to ignore the statutory minimum and the Guidelines entirely, but only if a § 5K1.1 departure is at play.  The second interpretation -- the one that Nolf advances -- reads subsection (e) as permitting courts to ignore the Guidelines entirely, but to defy the statutory minimum only to the extent of the § 5K1.1 departure.  The first interpretation -- the one that the Court chooses -- reads subsection (e) as permitting courts to ignore the statutory minimum, but only if they fully comply with the Guidelines.

---

[24] For simplicity's sake, the Court will express indicated sentences and departures in terms of months, rather than the ranges and levels that the Guidelines actually provide.

Opponents of the first interpretation point out that the defendant in the above hypothetical would receive the same sentence regardless whether the sentencing court thinks that he should be entitled to 80 months of downward variance, 40 months, 20 months, or zero months, and that this result means that vastly dissimilar defendants will be sentenced with unwarranted uniformity. Their objection is not invalid. This concern has apparently kept the Tenth Circuit from pulling the trigger -- at least not definitively -- on adopting the three-step sequence as mandatory, and has even lured the United States Court of Appeals for the Eighth Circuit away from its previous position that the three-step sequence is binding. It is worth noting at the outset, however, that even the second interpretation, Nolf's preferred reading, contains the same potential for unwarranted uniformity -- just a little less of it. That interpretation would still result in a defendant receiving the same sentence regardless whether the sentencing court thinks that he should be entitled to 80 months of downward variance, 40 months, or 20 months; it is only below 20 months that the differences impact the final sentence. This scenario highlights an important observation about statutory mandatory minimums: they often produce unwarranted uniformity. By design, statutory minimums sacrifice reasoned disparity at the low end of the sentencing range so that Congress can have peace of mind that sufficient sentences are being imposed on all offenders. The more control Congress retains over sentencing -- be it in the form of narrower sentencing ranges, enacting a larger number of more-specific crimes instead of a smaller number of broader crimes, or providing detailed enhancement and reduction factors -- the less control judges have to produce justified disparities in sentences among dissimilar offenders. It is Congress' prerogative to strike this balance where it pleases, and the courts should hesitate to tilt the scales in their own favor based on their perception of their own institutional competency.

What can be said with certainty about the Tenth Circuit's stance on § 3553(e) is: (i) the third interpretation from the above hypothetical, which results in a sentence that reflects all potentially applicable variances, is not permissible; (ii) the Court's interpretation, which adheres to the three-step sequence, is always permissible; and (iii) the Court's interpretation might, additionally, be the only permissible interpretation. The Tenth Circuit addressed this issue in United States v. A.B., in which the Honorable Jerome A. Holmes, United States Circuit Judge, writing for a unanimous panel, first shot down the third interpretation based on existing precedent:

> In [*United States v.*] *Campbell*, [995 F.2d 173 (10th Cir. 1993),] the defendant was convicted of conspiring to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and thus was subject to a ten-year mandatory minimum sentence under § 841(b)(1)(A). After the government moved for a downward departure based on his substantial assistance, the defendant moved for an additional downward departure based on his diminished capacity pursuant to U.S.S.G. § 5K2.13. In affirming the district court's refusal to grant the defendant's motion, we noted that "[w]hen a sentence is fixed by statute, any exception to the statutory directive must also be given by statute." 995 F.2d at 175. As embodied in § 3553(e), we interpreted the mandatory minimum exception to relate to only factors bearing on the defendant's substantial assistance. Accordingly, we concluded: "The mandatory language of 21 U.S.C. § 841(b)(1)(A), and the expressly limited exception granted in 18 U.S.C. § 3553(e), convince us that a downward departure from the statutory minimum sentence for any purpose other than that provided in U.S.S.G. § 5K1.1 would conflict with and therefore violate the statute." 995 F.2d at 175.
>
> A.B.'s response to *Campbell* -- predicated on *United States v. Booker*, 543 U.S. 220 (2005) -- is stated succinctly in his brief: "Because Campbell relied on the mandatory nature of the guidelines, and addressed only 'departures' and not reasonable sentences under § 3553(a), it no longer has the force of law after *Booker*." Aplt. Op. Br. at 11. Although we have not had occasion to address the post-*Booker* vitality of *Campbell*, the Eighth Circuit reviewed essentially the same issue in *United States v. Williams*, 474 F.3d 1130 (8th Cir. 2007). It concluded that "[n]othing in the reasoning of Booker expands the authority of a district court to sentence below a statutory minimum." 474 F.3d at 1132. Because it concluded that this authority under § 3553(e) was limited to consideration of substantial assistance factors, the Eighth Circuit rejected defendant's contention that the district court was permitted to "reduce the

sentence further based on factors, other than assistance, set forth in 18 U.S.C.
§ 3553(a)."  474 F.3d at 1130.

. . . .

[W]e conclude that *Booker* did not abrogate our holding in Campbell.
Furthermore, nothing in the logic of *Campbell* even suggests that its holding
(expressly relating to downward departures) should apply with any less force in
the context of variances under § 3553(a). . . .

Accordingly, the district court here was without authority to go further
below the statutory minimum based upon § 3553(a) factors after departing below
the mandatory minimum under the authority of § 3553(e).  In other words, "the
court ha[d] discretion to sentence below that minimum in a manner that reflects
the nature and extent of the substantial assistance provided by the defendant-no
more, no less."  United States v. Ahlers, 305 F.3d 54, 60 (1st Cir. 2002).
Therefore, the district court could not have erred in failing to consider the
§ 3553(a) factors after it applied a downward departure pursuant to § 3553(e).

United States v. A.B., 529 F.3d at 1281, 1284-85 (last alteration in original).  Thus, a sentencing

court may not use the third interpretation under any circumstance.

The Tenth Circuit was less clear about whether the Nolf's interpretation is ever

permissible.  The district judge in United States v. A.B. had declined to grant the defendant's

desired variance, and the Tenth Circuit used the posture of the case to avoid squarely deciding

whether the three-step sequence is mandatory.  It addressed the issue in dicta, however, opining

that Nolf's interpretation of § 3553(e)

is -- at the very least -- in significant tension with our caselaw, which may require
district courts to consider all available Guidelines departures before factoring
§ 3553(a) factors into the sentencing calculus.  See United States v. Calzada-
Maravillas, 443 F.3d 1301, 1305 (10th Cir. 2006).  See also Lee D. Heckman,
Note, The Benefits of Departure Obsolescence: Achieving the Purposes of
Sentencing in the Post-Booker World, 69 Ohio St. L.J. 149, 152 n.16, 171 n.136
(identifying the Tenth Circuit as one of the circuits that "require[s] calculating
applicable departures as part of consulting the Guidelines," and citing *Calzada-
Maravillas* as support for this proposition).  Cf. Gall v. United States, 552 U.S. at
49 ("[A] district court should begin all sentencing proceedings by correctly
calculating the applicable Guidelines range.").

In *Calzada-Maravillas*, we stated: "Because the Supreme Court required each district court to 'consult those Guidelines and take them into account when sentencing,' a district court's sentencing decision 'necessarily includes consideration of these Guideline departure provisions.'"  443 F.3d at 1305 (citation omitted)(quoting United States v. Booker, 543 U.S. at 264; United States v. Sierra-Castillo, 405 F.3d 932, 939 n.5 (10th Cir. 2005)).  In support of this statement, *Calzada-Maravillas* cited cases that could be read to require district courts to consider available Guidelines departures as part of their initial consultation of the Guidelines.  See 443 F.3d at 1305 (citing United States v. Haack, 403 F.3d 997 (8th Cir. 2005); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)).  At least one commentator has concluded that the Tenth Circuit is among the ranks of the "vast majority of circuits" that (in substance) employ "a three-step process where the sentencing judge: (1) calculates the applicable guidelines range; (2) calculates any applicable departures from that guideline range; and (3) determines whether to follow this sentence or vary from it based on § 3553(a) factors."  Heckman, supra, at 152 (collecting cases and including the Tenth Circuit among the "vast majority of circuits").  See, e.g., United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006)(noting that "our post-*Booker* precedent instructs district courts to follow a three-step sentencing process" in which, first, they must "calculate a defendant's Guidelines sentence precisely," second, they must "state on the record whether they are granting a departure," and third, "exercise their discretion by considering relevant § 3553(a) factors" (internal quotation marks and alterations omitted)).

If our caselaw requires rigid adherence to this three-step approach, A.B.'s argument must fail at the outset, for he seeks to at least partially reverse the second and third steps.  However, the appropriate timing of a district court's consideration of the availability of Guidelines departures may still be an open question in this circuit.  The issue in *Calzada-Maravillas* was a somewhat unrelated one: that is, whether "the district court erred in departing upward without providing notice" to the defendant.  443 F.3d at 1302.  Arguably, to the extent that the court addressed Guidelines departures, its concern only was whether Guidelines departures were still a viable tool after *Booker* -- that is, whether *Booker* rendered Guidelines departures obsolete.  443 F.3d at 1305.  Cf. Heckman, supra, at 153 (focusing principally on the viability of Guidelines departures post-Booker and proposing that they "should be recognized for what they've become: obsolete").  The viability issue (rather than the timing question) appears to have been the principal concern of our prior decision upon which we relied in *Calzada-Maravillas*.  See 443 F.3d at 1305 (citing United States v. Sierra-Castillo, 405 F.3d at 939 n.5).  We ultimately concluded in *Calzada-Maravillas* that "guideline departures survive Booker."  443 F.3d at 1305.  Therefore, *Calzada-Maravillas* conceivably could be read as resolving only the question of the post-*Booker* viability of Guidelines departures, not the timing of the district court's consideration of them.

> In this case, we need not decide whether *Calzada-Maravillas* has resolved the timing issue in favor of the three-step approach or something akin to it. And, more specifically, we are not obliged to determine whether the three-step approach -- even if binding in this circuit -- would be appropriately applied in the context of substantial assistance downward departures under § 3553(e).

United States v. A.B., 529 F.3d at 1285-88 (alterations and omissions in original)(footnotes omitted). The Court interprets United States v. A.B.'s cryptic proclamations about what "may still be an open question" as avoidance of an issue that need not be decided to resolve the case before it, and not an intimation of doubt about the three-step sequence's vitality. Judge Holmes lent some credence, however, to its detractors, noting that the Court's interpretation of § 3553(e)

> conceivably could engender disparities between defendants who are similarly situated insofar as their advisory Guidelines ranges are above the applicable statutory minimum -- specifically, those who provided no cooperation would be eligible to receive downward variances to the mandatory minimum, but those who cooperated and received substantial assistance downward departures would not (i.e., no variance would be permitted before the substantial assistance downward departure under the three-step approach and, under a rule like *Campbell*'s, no variance would be permitted after the departure). See United States v. Coyle, 506 F.3d 680, 683-84 (2007). And it arguably "would create tension with the requirements of *Booker* that a sentence above a statutory minimum be governed by § 3553(a) as a whole, not only by the sentencing guidelines." 506 F.3d at 683. Indeed, although it has otherwise endorsed the three-step approach, these possible adverse consequences led the Eighth Circuit in *Coyle* to deviate from that approach and to consider the § 3553(a) factors before addressing the government's substantial assistance motion. 506 F.3d at 683-84.

United States v. A.B., 529 F.3d at 1287 n.16. As Judge Holmes points out, the Eighth Circuit, after years of assiduous adherence to the three-step sequence, now allows district courts to apply variances before granting a § 5K1.1 departure, thus permitting -- but not requiring -- Nolf's interpretation. In 2007, in United States v. Williams, 474 F.3d 1130 (8th Cir. 2007), the Eighth Circuit stated:

> [W]e have twice reserved deciding whether, in light of *United States v. Booker*, a district court may also rely on § 3553(a) to reduce a sentence further below the statutory minimum once the government has filed a motion under § 3553(e). . . . To the extent the question remains open . . . , we conclude that the

> text of § 3553(e) provides a clear answer, and that *Booker* does not expand the
> district court's authority to impose a sentence below a statutory minimum.

474 F.3d at 1131.  Later that year, in United States v. Dalton, 478 F.3d 879 (8th Cir. 2007), the

Eight Circuit stated:

> When sentencing a defendant, the district court must first determine the applicable
> advisory Guidelines range . . . .  The district court can then decide if a traditional
> departure from that advisory range is warranted, including one based upon
> substantial assistance motions, by utilizing the Guidelines and the policy
> statements contained therein, and if so, arrive at a final advisory Guidelines
> sentence.  Once this final advisory Guidelines sentence is arrived at by the district
> court, the court should then evaluate the factors set forth in § 3553(a) and
> determine     if    a    Guidelines    or    a    non-Guidelines    sentence    is
> warranted. . . .  However, the last step in the district court's determination of the
> ultimate sentence is eliminated if a Guidelines departure granted in step two takes
> the sentence below a statutory mandatory minimum sentence.

478 F.3d at 881.

In October 2007 -- which turned out to be a banner year for Guidelines application

sequence jurisprudence in the Eighth Circuit -- the Eighth Circuit abruptly changed course,

holding, in United States v. Coyle, 506 F.3d at 683-84, that district courts may apply variances

before applying a § 5K1.1 departure to satisfy § 3553(e).[25]  The Eighth Circuit is the only circuit

that the Court has identified that permits this interpretation.[26]

---

[25] The Eighth Circuit's decision to reverse course is highly suspect as a matter of
horizontal stare decisis, and is based on reasons the Court has already addressed -- most notably
the alleged unfairness that results from variances going to waste when a defendant's post-
§ 5K1.1 sentence is too close to the statutory minimum.  See United States v. Coyle, 506 F.3d at
683.  The Eighth Circuit outlined its reasoning as follows:

> To be sure, we have said that a post-*Booker* sentence normally should be
> determined in a sequential manner, with the district court first determining the
> applicable guideline range, then deciding whether any traditional guideline
> departures are warranted, and finally considering the possibility of varying from
> the guideline sentence based on the factors in § 3553(a).  See United States v.
> Haack, 403 F.3d 997, 1003 (8th Cir. 2005).  Dicta in *Dalton* . . . suggested that the
> "last step" in this sequence -- consideration of the § 3553(a) factors -- is
> "eliminated" if a traditional guidelines departure takes the sentence down to a

statutory minimum sentence.   478 F.3d at 881.   But *Dalton . . .*, like *Williams*, involved an advisory guideline range that equaled the statutory minimum, so the court had no occasion to consider the situation presented by *Coyle*, where the advisory sentence (before departures) exceeds the statutory minimum.   The result in *Dalton . . .* was dictated by the text of § 3553(e) and the holding in *Williams*, without regard to the order in which the district court may have considered § 3553(a) and § 3553(e).

        We see nothing in *Booker* or the relevant statutes that prevents a district court in this situation from relying to some degree on both § 3553(a) and § 3553(e) to fashion an appropriate sentence.   The text of § 3553(e) prohibits a district court from relying on factors other than assistance as a basis for sentencing below the statutory minimum.   United States v. Williams, 474 F.3d at 1131-32.   But here, the district court had some flexibility above the statutory minimum to determine Coyle's sentence in accordance with the factors in § 3553(a).

        The sequential ordering process that we have developed after *Booker* is not dictated directly by *Booker* or any statute.   It was fashioned by our court to maintain the distinction between sentencing "departures" and "variances," and to facilitate meaningful appellate review.   See United States v. Solis-Bermudez, 501 F.3d 882, 884-85 (8th Cir. 2007).   It helps to foster compliance with *Booker* by ensuring that the district court properly considers the advisory guideline sentence, which remains an important factor that a district court must "consider" and "take into account."   United States v. Booker, 543 U.S. at 259, 264; United States v. Haack, 403 F.3d at 1003.   But a rigid ordering in this case more likely would frustrate the objectives of Booker and the Sentencing Reform Act.   And allowing the district court leeway to consider both § 3553(a) and § 3553(e) would neither eliminate the distinction between departures and variances nor frustrate appellate review, if the court makes a clear record concerning the basis for arriving at the final sentence.

United States v. Coyle, 506 F.3d at 683.   The Court is unmoved by this logic.   The three-step sequence was not "fashioned by [the Eight Circuit] to maintain the distinction between sentencing 'departures' and 'variances,' and to facilitate meaningful appellate review."   506 F.3d at 683.   The three-step sequence is a part of the Guidelines themselves, explicitly laid out in U.S.S.G. § 1B1.1, and necessary to their proper application.   While the Eighth Circuit's interpretation may lead to the imposition of "better" sentences -- it will for an absolute certainty lead to sentences that the courts themselves consider to be better -- it exceeds the authority that Congress granted to the courts.

        [26] The United States Court of Appeals for the Seventh Circuit considers the Guidelines discretionary departures -- the second step of the three-step sequence -- obsolete after United States v. Booker, and, thus, does not apply them.   See United States v. Johnson, 427 F.3d 423 (7th Cir. 2005)("Johnson's framing of the issue as one about "departures" has been rendered

On the other hand, the bulk of circuits appear to require the three-step sequence, although this is sometimes hard to discern, because every circuit that still recognizes departures allows -- and uses as a default -- the three-step sequence.  See United States v. Wallace, 461 F.3d 15, 32 (1st Cir. 2006); United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006)("Our post-*Booker* precedent instructs district courts to follow a three-step sentencing process."  (citing United States v. King, 454 F.3d 187 (3d Cir. 2006))); United States v. Crosby, 397 F.3d 103, 111-14 (2d Cir. 2005); Heckman, supra, at 152 & n.16 ("[T]he vast majority of circuits require calculating the Guidelines and then calculating applicable departures as was done prior to *Booker*.  In practice, this is a three-step process . . . .  The First, Second, Third, Fourth, Fifth, Sixth, Eighth, Tenth, and Eleventh Circuits all require calculating applicable departures as part of consulting the Guidelines.").

For the foregoing reasons, the Court concludes that it may not impose a sentence pursuant to 18 U.S.C. § 3553(e) -- i.e., a sentence below 21 U.S.C. § 841's mandatory minimum -- except pursuant to strict application of the Guidelines, including the three-step sequence outlined in U.S.S.G. § 1B1.1.  The Court will apply the three-step sequence outlined in U.S.S.G. § 1B1.1, and calculate a pre-variance sentencing range of 63-78 months.

---

obsolete by our recent decisions applying *Booker*.  It is now clear that after Booker what is at stake is the reasonableness of the sentence, not the correctness of the "departures" . . . .  Now, instead of employing the pre-*Booker* terminology of departures, we have moved toward characterizing sentences as either fitting within the advisory guidelines range or not."  (citations omitted)).  The United States Court of Appeals for the Ninth Circuit may as well.  See United States v. Mohamed, 459 F.3d 979 (9th Cir. 2006).  The Tenth Circuit has not adopted this approach, and continues to consider Guidelines departures.  See United States v. Calzada-Maravillas, 443 F.3d at 1305.

### III.   THE COURT WILL VARY NOLF'S SENTENCE DOWNWARDS TO THE FULL EXTENT OF THE LAW -- TO THE SIXTY-MONTH STATUTORY MINIMUM -- ON THE BASIS OF NOLF'S DIFFICULT UPBRINGING.

The Court will vary Nolf's sentence from the Guidelines range of 63-78 months down to the statutory mandatory minimum of 60 months.  The Guidelines are advisory, and the Court may vary from their application whenever the resulting sentence fails to satisfy § 3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary," to comply with the factors in § 3553(a)(2).  18 U.S.C. § 3553(a).  See U.S.S.G. § 1B1.1(c); United States v. Booker, 543 U.S. 220.

Nolf was raised in exceptionally difficult circumstances.  His mother, with whom he remains close, attempted suicide twice during his childhood, on one occasion requiring Nolf to pump his mother's stomach while awaiting an ambulance.  See First Nolf Brief at 22.  The arrest and prosecution of this offense has disrupted Nolf's seemingly otherwise nurturing relationships with his wife and child, and he has additionally suffered as a result of his cooperation with the government: he was viciously attacked in prison by roughly ten other inmates as a result of his assistance to the United States.  See First Nolf Brief at 25.  A psychological expert that Nolf hired, Dr. Rapoport, reports that "in all likelihood Mr. Nolf committed the instant offense while suffering from significantly reduced mental capacity and that the reduced mental capacity contributed substantially to the commission of the offense itself."  First Nolf Brief at 24.  Last, there remains some residual merit to Nolf's argument that the career offender provision is unfair in his case: Nolf's otherwise applicable offense level would be a 26 -- which would be reduced to 23 after applying the § 3E1.1 acceptance of responsibility adjustment -- and his criminal history category would be III.  See PSR ¶ 28, at 8; id. ¶ 36, at 11.  Absent the career offender provision, Nolf would be subject to sentence of 57-71 months.  See U.S.S.G. § 5A.  If the United

States stayed with the 11-level departure, Nolf's sentence range would be 12-18 months.  See U.S.S.G. § 5A.

The result of a 60-month sentence is that Nolf will be incarcerated for over three times that long, and Nolf -- whose prior criminal offenses resulted in relatively short periods of incarceration, see PSR ¶¶ 33-35, at 9-11 -- now understands that the career offender provision will not go away if he is again convicted of another crime upon his release.  As such, a 60-month sentence serves the needs of deterrence and rehabilitation, and, considering the assistance Nolf provided to the United States, and the pain he endured for doing so, the sentence promotes respect for the law and effectuates just punishment.  Five years of incarceration, plus four years of supervised release, provides ample time for Nolf to seek the education, vocational, medical, and rehabilitative treatment that he needs, and the Court is of the opinion that the public will be no safer from Nolf if he is released after 63 months than they will be when he is released after 60 months.  In sum, a sentence of 60 months is sufficient to fulfill the goals of § 3553(a), and, as the statutory minimum of 21 U.S.C. § 841(b)(1)(B) binds the Court, the Court will sentence Nolf to the lowest sentence available under the law.

**IT IS ORDERED** that the Plaintiff United States' Sealed Motion for Downward Departure, filed August 16, 2012 (Doc. 146), is granted, and Defendant Kevin Michael Nolf is sentenced to 60 months incarceration, reflecting a career offender criminal history categorization of VI and offense level of 34, a 3-level decrease for acceptance of responsibility, a 12-level downward departure for providing substantial assistance to the government, and, finally, a 3-month downward variance from the Guidelines-prescribed sentence range of 63-78 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   Acting United States Attorney
James R.W. Braun
Nicholas Jon Ganjei
   Assistant United States Attorneys
Albuquerque, New Mexico

      *Counsel for the Plaintiff*

Alonzo J. Padilla
Susan B. Dunleavy
   Assistant Federal Public Defenders
Albuquerque, New Mexico

      *Counsel for the Defendant*